23155

The STATE, Respondent v. Rickie Tim CALDWELL, Appellant.

(388 S. E. (2d) 816)

Supreme Court

*Chief Atty. David I. Bruck* and *Asst. Appellate Defenders Wanda Hagler Haile* and *Joseph L. Savitz, III, S. C. Office of Appellate Defense,* Columbia, *for appellant.*

*Atty. Gen. T. Travis Medlock, Chief Deputy Atty. Gen. Donald J. Zelenka,* Columbia, and *Sol. William L. Ferguson,* York, *for respondent.*

Heard Oct. 19, 1989.

Decided Feb. 5, 1990.

HARWELL, Justice:

In the first phase of a bifurcated capital trial, appellant, Rickie Tim Caldwell (Caldwell), was found guilty of armed robbery and of kidnapping and murdering Melvin Kelly, Jr. He was sentenced to death upon recommendation of the trial jury at the end of the second phase. He also received a twenty-five year concurrent sentence for armed robbery. This case consolidates Caldwell's direct appeal and our mandatory review of the death sentence. We affirm the convictions, reverse the death sentence, and remand for a new sentencing proceeding.

## FACTS

On January 22, 1988, the victim's body was discovered in a ravine in his cow pasture in York County. His truck was parked nearby. The State established his truck and body were found in an area of his farm where the victim ordinarily did not go, thus giving rise to the inference that he would not have freely and voluntarily visited this area. The victim died from gunshot wounds to the head. The State's theory was that Caldwell drove his motorcycle to York, killed Kelly, and then drove to his sister's home in Charlotte where he attempted to destroy evidence of his crimes.

At the murder scene, the police retrieved a wire that had been cut and tied to a gate post near the farm. A pair of pants with an identification number was found by the barn. Remnants of shells that had been used to kill the victim were also found. Detectives testified that the wire had been cut by a pair of wire cutters found under the seat of Caldwell's motorcycle and that the pants had the same identification number as another pair found at Caldwell's home in Gastonia. Testimony established that pellets found at the murder scene were similar to the ones found in the road near Caldwell's home and in a trash can at his sister's home

in Charlotte. The pellets were all manufactured by the same company for use in a twelve-gauge shotgun.

Evidence was also presented that a man wearing a black helmet on a motorcycle had been in the area of the murder at the time it was committed. The State introduced a helmet and motorcycle into evidence, which witnesses positively identified as the ones they had seen the day of the murder. Caldwell was also seen entering a nearby bar and grill at this time.

The Crumps (Caldwell's sister, brother-in-law, and nephews) testified that Caldwell arrived by motorcycle at their home in Charlotte on January 22, 1988, at 5:30 p.m. and left a twelve gauge sawed-off shotgun. On January 27, 1988, Caldwell returned to the Crumps' home to retrieve the shotgun as well as some shotgun pellets. At this time, Caldwell confessed to Ronald Crump, Sr., his brother-in-law, that he had killed the victim.

Personal items had been stolen from the victim, including keys, a billfold, and a watch. Caldwell's nephews, Scotty Shane Crump (Scotty) and Ronald Crump, Jr. (Ronald, Jr.) testified that on the evening of January 27, 1988, Caldwell burned items in a garbage can at their home. Scotty testified that Caldwell told him that he had beaten up a man, taken his wallet, and was burning the contents. Ronald, Jr., remembered seeing a watchband near the trashcan. Several weeks later, the watch was found in the pool at the Crumps' home. The victim's wife testified that the watch had belonged to her husband.

Caldwell denied being present in York on January 22, 1988. He also denied knowing the victim or where his farm was. He stated that he did not own a sawed-off shotgun and that he did not murder the victim. Caldwell testified that he had been in the area of the murder the day before it occurred. He said that he stopped by a local bar and grill on the way to his uncle's home in Hickory Grove. His motorcycle kept cutting off so he pushed it through a gate at a farm and planned to leave it by the barn. He got the motorcycle started, however, and continued to his uncle's house. That afternoon, he stopped by the same bar and grill on the way home to Gastonia.

Caldwell testified that on the date of the murder, he was

home during the morning except for a trip to the grocery with another sister, Johnnie Mae Lee (Johnnie Mae). They both testified that they returned from the grocery at approximately 10:30 a.m. Caldwell testified that he left his home about 12:30 p.m. to meet a friend at the park and returned home near 1:30 or 2:00 p.m. Caldwell stated that at approximately 4:30 p.m., he (by motorcycle) and Johnnie Mae (by car) left his home in Gastonia to visit their mother who was staying at the Crumps' home in Charlotte. Johnnie Mae and other witnesses testified in support of Caldwell's version of events.

## DISCUSSION

### I. PRETRIAL ISSUES

A pretrial motion hearing was held at which Solicitor William L. Ferguson, Appointed Counsel Keith A. Gatlin (Gatlin), and Public Defender S. Michael Camp (Camp) were present. Caldwell had been committed to the State Hospital for evaluation and was not present. The subject of the hearing was to determine whether Gatlin should be released as counsel because Leland Greely, a former solicitor, had since gone to work in Gatlin's office. Gatlin wished to avoid the appearance of any impropriety or conflict. The trial judge denied Gatlin's motion to be released. Caldwell contends that he had a right to be present under the Sixth Amendment, the Fourteenth Amendment, Criminal Procedure Rule 15 (1988) and the common-law right of presence.

The constitutional right to presence is rooted to a large extent in the confrontation clause of the Sixth Amendment. *Illinois v. Allen,* 397 U. S. 337, 90 S. Ct. 1057, 25 L. Ed. (2d) 353 (1970). The United States Supreme Court has recognized that this right is also protected by the due process clause in some situations where the defendant is not actually confronting witnesses or evidence against him. In *Snyder v. Massachusetts,* 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674 (1934), the Court explained that a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge ... [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by

his absence, and to that extent only," *Id.*, at 105-108, 54 S. Ct. at 332-333, 78 L. Ed. at 678-679. These same principles were reiterated recently in *Kentucky v. Stincer*, 482 U. S. 730, 107 S. Ct. 2658, 96 L. Ed. (2d) 631 (1987).

■ The court in *Snyder* also stated that the exclusion of a defendant from a trial proceeding should be considered in light of the whole record. Further, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure. *Kentucky v. Stincer* at 745, 107 S. Ct. at 2667, 96 L. Ed. (2d) at 647.

■ We recognize that the better practice would have been to have the defendant present at the pre-trial motion hearing. In this case, however, Caldwell's absence during this pretrial motion hearing does not require automatic reversal of Caldwell's conviction. In light of the entire proceeding, this was not a stage in the criminal proceeding that was critical to its outcome such that a fair and just hearing was thwarted by Caldwell's absence. Caldwell has not demonstrated what, if any, benefit his presence would have contributed to the proceeding.

For these same reasons, Caldwell's reliance on the common-law right of presence also fails. *See State v. Faries*, 125 S. C. 281, 118 S. E. 620 (1923) (defendant's presence at the hearing of the motions for change of venue and for continuance was not essential where his absence did not deprive him of any right, technical or substantial). Similarly, Caldwell's reliance on Criminal Procedure Rule 16 is misplaced because at the time of the pretrial motion hearing, he had not been indicted, his "trial" had not begun, and this did not amount to a "stage of the trial" protected by the federal or state constitutions.

## II. VOIR DIRE AND JURY SELECTION ISSUES

### A. QUALIFICATION OF JURORS

Caldwell argues that the trial court abused its discretion in qualifying two members of the jury venire as prospective jurors because their responses indicated that they would not be fair and impartial. Caldwell submits that because he was

required to utilize two peremptory challenges to exclude these two jurors who should have been removed for cause, he was denied his statutory right to ten peremptory challenges and due process.

A criminal defendant has no right to a trial by any particular jury, but only a right to a trial by a competent and impartial jury. *State v. Gaskins*, 284 S. C. 105, 326 S. E. (2d) 132 (1985), *cert. denied*, 471 U. S. 1120, 105 S. Ct. 2368, 86 L. Ed. (2d) 266 (1985). It is the duty of the trial judge to see that a jury of unbiased, fair and impartial persons is impaneled. *State v. Matthews*, 291 S. C. 339, 353 S. E. (2d) 444 (1986). A determination of whether a juror is qualified to serve on a death penalty case is within the sole discretion of the trial judge and not reversible on appeal unless wholly unsupported by the evidence. *State v. Plemmons*, 286 S. C. 78, 332 S. E. (2d) 765 (1985), *vacated on other grounds*, 476 U. S. 1102, 106 S. Ct. 1943, 90 L. Ed. (2d) 353 (1986). A voir dire examination must be viewed in its entirety to determine whether the trial judge erred in his qualification of prospective jurors. *State v. Drayton*, 293 S. C. 417, 361 S. E. (2d) 329 (1987), *cert. denied*, 484 U. S. 1079, 108 S. Ct. 1060, 98 L. Ed. (2d) 1021 (1988).

The first juror had admittedly read articles discussing the investigation and identifying Caldwell as the perpetrator. Although the juror stated that at some point, he had formed an opinion that Caldwell was "probably guilty," he qualified this statement by saying that he had changed his mind when he was summoned as a juror.

The second juror also had read several newspaper articles about the crime. While he had already formed an opinion on what he had read, he indicated that he would have to hear all of the evidence before he could reach a final conclusion. Both jurors indicated that they could not only return a verdict of life imprisonment or death, but that they could find Caldwell not guilty. They also indicated that they could decide the case based only on evidence presented at trial and could disregard anything they had read or heard about the case. In view of the responses on voir dire, we find that the trial judge did not abuse his discretion in qualifying either juror.

## B. CHANGE OF VENUE

After the jury voir dire questioning had ended, Caldwell renewed a previous motion for a change of venue asserting that pretrial publicity precluded him from obtaining a fair and impartial jury at trial, particularly in light of the fact that eleven seated jurors and two alternate jurors were aware of media coverage of the crime.

A motion for a change of venue is addressed to the sound discretion of the trial judge and will not be disturbed absent an abuse of discretion. *State v. Copeland*, 278 S. C. 572, 300 S. E. (2d) 63 (1982), *cert. denied, Roberts v. South Carolina*, 463 U. S. 1214, 103 S. Ct. 3553, 77 L. Ed. (2d) 1399 (1983). When a trial judge bases the denial of a motion for a change of venue because of pretrial publicity upon an adequate voir dire examination of the jurors, his decision will not be disturbed absent extraordinary circumstances. *State v. Thompson*, 278 S. C. 1, 292 S. E. (2d) 581 (1982), *cert. denied*, 456 U. S. 938, 102 S. Ct. 1996, 72 L. Ed. (2d) 458 (1982). Mere exposure to pretrial publicity does not automatically disqualify a prospective juror. *State v. Ayers*, 284 S. C. 266, 325 S. E. (2d) 579 (Ct. App. 1985). When jurors have been exposed to such publicity, a denial of a change of venue is not error where jurors are found to have the ability to lay aside any impressions or opinions and render a verdict based on the evidence presented at trial. *Id.* It is the defendant's burden to demonstrate actual juror prejudice as a result of such publicity. *State v. Goolsby*, 275 S. C. 110, 268 S. E. (2d) 31 (1980), *cert. denied*, 449 U. S. 1037, 101 S. Ct. 616, 66 L. Ed. (2d) 500 (1980).

While a number of jurors were aware of the crime, those jurors expressed to the trial judge no doubt or reservation of their ability to impartially serve as a juror and to decide the matter solely on the evidence presented. Caldwell has not demonstrated any prejudice or extraordinary circumstances and we find that the trial judge did not abuse his discretion in denying the motion for a change of venue.

## C. PEREMPTORY STRIKES

Caldwell asserts that he was denied two of ten peremptory challenges allowed by S. C. Code Ann. § 14-7-1110 (Supp.

1988). He argues that the clerk of court erroneously attributed two peremptory challenges to the defense. The transcript originally read:

DEPUTY CLERK: [Juror A]
THE CLERK: What say ye for the State?
[SOLICITOR]: Present the juror.
THE CLERK: And the defendant?
[DEFENSE ATTORNEY]: Swear the juror.
THE CLERK: Your are excused . . .
DEPUTY CLERK: [Juror B]
THE CLERK: What say ye for the State?
[SOLICITOR]: Present the juror.
THE CLERK: And the defendant?
[DEFENSE ATTORNEY]: Swear the juror.
THE CLERK: You are excused . . .

Upon request of the State, the court reporter reviewed her records for the accuracy of these responses and determined that her records reflected that as to both jurors, an accurate response from the defense attorney was the word "excuse" rather than "swear." The State moved to amend the transcript to include the corrected responses. Both the State and Caldwell's appellate defender agreed to the addendum to the transcript. The record reflects that Caldwell peremptorily challenged Jurors A and B thereby exercising all ten challenges. This argument lacks merit.

### III. GUILT PHASE ISSUES: SOLICITOR'S CLOSING ARGUMENT

### A. SOLICITOR'S COMMENTS AS TO WITNESS FOR THE ACCUSED: INTIMATION THAT DEFENDANT PERSUADED WITNESS TO OFFER PERJURED TESTIMONY

On January 29, 1988, Johnnie Mae, Caldwell's sister, told SLED agents Andy Wallace (Wallace) and Ron Cook that on the day of the murder, she and Caldwell had left Caldwell's motocycle at the Regal Inn in Gastonia and then proceeded to the Crumps' home in Charlotte in her car. On February 1, 1988, Johnnie Mae was further questioned by Wallace. At trial, Johnnie Mae testified that on the day of the murder, she and Caldwell had gone to Charlotte to visit their mother.

However, she testified that she went by car and Caldwell rode his motorcycle.

On cross-examination, the solicitor questioned Johnnie Mae about the statements she had previously made. Johnnie Mae recalled being questioned, but denied she had admitted to Wallace on February 1, 1988, that she had lied on January 29, 1988, about leaving Caldwell's motorcycle in Gastonia. In reply, Wallace testified that on February 1, 1988, Johnnie Mae told him that she had lied about leaving Caldwell's motorcycle in Gastonia and that she was trying to throw the SLED agents off track because she feared her brother might be sentenced to death by the electric chair and because he had asked her not to say anything to the SLED agents about the motorcycle.

In the solicitor's closing argument, he commented on the fact that at trial, Johnnie Mae denied admitting to Wallace that she had lied earlier to him in order to create an alibi for Caldwell. The solicitor also made comments to the effect that Johnnie Mae was trying to cover for her brother and that the believability of anything that she said, including her testimony at trial, should be questioned. Caldwell argues that the solicitor erred when he addressed the weight to be given the testimony of Caldwell's sister, Johnnie Mae. Caldwell contends that the solicitor argued outside the record when he stated that Johnnie Mae admitted to Wallace that her brother had her lie about the motorcycle.

In *State v. Durden*, 264 S. C. 86, 212 S. E. (2d) 587 (1975), we set forth the parameters of permissible prosecutorial argument. So long as the prosecutor stays within the record and its reasonable inferences, he may legitimately appeal to the jury to do their full duty. *Id.* at 92, 212 S. E. (2d) at 590. A solicitor has the right to state his version of the testimony and to comment on the weight to be given such testimony. *State v. Allen,* 266 S. C. 468, 224 S. E. (2d) 881 (1976). A review of the closing argument is based upon the standard of "whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Hawkins,* 292 S. C. 418, 421, 357 S. E. (2d) 10, 12 (1987).

The comments made by the solicitor were proper in view of the evidence contained in the record because they related to a material issue: Johnnie Mae's cred-

ibility. The solicitor's comments went directly to the believability of Johnnie Mae's testimony that attempted to create an alibi for Caldwell in view of the fact that her previous alibi attempt had been called into question by Wallace's testimony.

Caldwell proffers *State v. Bailey,* 279 S. C. 437, 308 S. E. (2d) 795 (1983) for the proposition that the State is prohibited from suggesting that a defendant attempted to persuade a witness to offer perjured testimony where there is nothing in the record to connect the defendant with such an attempt. However, this was unlike the situation in *Bailey* where the reply testimony was used to create the inference that appellant had attempted through his father and brother to manufacture a defense by procuring perjured testimony, when there was no evidence to connect appellant with the attempt other than his blood relationship. Here, there was evidence of Caldwell's attempt other than his blood relationship with Johnnie Mae. Also in *Bailey,* the evidence was merely collateral rather than material to any issue in the case. This issue lacks merit.

## B. SOLICITOR'S COMMENTS AS TO WITNESSES FOR THE STATE

During the trial, the Crumps testified on behalf of the State. The solicitor argued that the Crumps were credible witnesses who should be admired for their fortitude in telling the truth about their own family member. Caldwell asserts that this constituted an improper bolstering of these witnesses because their credibility had not been attacked by the defense and because this injected an arbitrary factor into the proceedings.

A solicitor's argument concerning the credibility of the State's witnesses based on the record and its reasonable inferences is not error. *State v. Durden, supra.* A prosecutor has the right to state his version of the evidence and to comment on the weight to be given such testimony. *State v. Allen, supra.* The remarks made by the solicitor referred to critical State witnesses in the prosecution of the murder and were directly related to the evidence in the record. The comments were premissible as to the credibility and common sense biases of the witnesses that

were apparent from the evidence. This exception is without merit.

## IV. SENTENCING PHASE ISSUES

### INSTRUCTION AS TO STATUTORY MITIGATING CIRCUMSTANCES

Caldwell contends the trial judge erred in failing to charge the statutory mitigating circumstances found in S. C. Code Ann. § 16-3-20(C)(b)(2), (6), and (7) (Supp. 1988). Caldwell claims that because there was evidence presented establishing or raising the inference that at the time of the murder he suffered from a personality disorder, he was entitled to such instructions.

■ Although a specific request for these charges was not made at trial, this Court reviews this error *in favorem vitae. State v. Pierce,* 289 S. C. 430, 346 S. E. (2d) 707 (1986). The trial judge has a duty to review all statutory mitigating circumstances and instruct the jury as to any which may be supported by the evidence and not merely those requested by the defendant. *State v. Bellamy,* 293 S. C. 103, 359 S. E. (2d) 63 (1987). In deciding which statutory mitigating circumstances may be supported, the trial judge is concerned only with the existence of the evidence and not its weight. *Id.*

■ Dr. Stephen Lokke (Dr. Lokke), the defense psychiatrist, testified that after his examination of Caldwell, his opinion was that Caldwell had an antisocial personality which is synonymous with a psychopathic personality. Dr. Lokke described the condition as one in which an individual is not constrained by societal norms for behavior and therefore is unlikely to obey rules on his own. He also stated that if given the opportunity, Caldwell could repeat the act and kill again.

In reaching his diagnosis, Dr. Lokke used a list of criteria suggesting that the disorder begins early in life. He stated that as an individual gets older, he tends to outgrow the disorder. Dr. Lokke testified that Caldwell had not outgrown the illness as of May 23, 1988, the date of the trial. Because this evidence raised the inference that Caldwell was suffering from a mental disorder *at the time* the murder was committed, the trial judge erred in failing to instruct the

statutory mitigating circumstances pursuant to Sections 16-3-20(C)(b)(2), (6), and (7). *See, State v. Pierce, supra.* Consequently, Caldwell is entitled to a new sentencing hearing based upon this finding.

## V. CONCLUSION

We affirm Caldwell's convictions. Because we reverse the death sentence on the grounds discussed, we need not address the remaining exceptions raised during the sentencing phase of the trial. Accordingly, we remand for a new sentencing proceeding.

Affirmed in part; reversed and remanded in part.

GREGORY, C. J., and CHANDLER, FINNEY and TOAL, JJ., concur.