24420

The STATE, Respondent v. George ADAMS, Appellant.
(470 S.E. (2d) 366)

Supreme Court

*Senior Assistant Appellate Defender Wanda H. Haile,* of *South Carolina, Office of Appellate Defense,* Columbia, *for Appellant.*

*Attorney General Charles Molony Condon, Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorneys General Harold M. Coombs, Jr.* and *William Edgar Salter, III,* and *Solicitor Warren B. Giese,* Columbia, *for Respondent.*

Heard Feb. 6, 1996.

Filed Apr. 29, 1996.

TOAL, Associate Justice:

Appellant George Adams was convicted on charges of murder and armed robbery. On appeal, Adams alleges the trial court erred in allowing evidence of prior bad acts, particularly of his participation in another armed robbery and of his prior cocaine use; in finding the defense violated *Batson*; and in refusing to instruct the jury on the definition of reasonable doubt. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

According to testimony presented at trial, appellant Adams, James Brown, Rosena Farmer, and a few other friends were smoking crack cocaine together in the early morning on June 17, 1992. About 5:30 a.m., they decided they needed more

money for drugs, so Adams and Brown went into a Circle K convenience store located on Columbia College Drive in Columbia. Brown had a gun. Adams and Brown demanded that the cashier give them money, and the cashier complied. Adams, Brown, and the others used the money from that robbery to purchase more crack, which they smoked immediately.

When they ran out of crack again at approximately 6:00 a.m., Farmer suggested Brown and Adams rob Johnny's Grocery, a small grocery store/grill run by Mildred and Joe Collins. Farmer then directed Brown and Adams to Johnny's Grocery. Mildred Collins testified at trial that two men entered the store. The man in the white shirt (Brown) asked for cigarettes, and the man in the blue shirt (Adams) asked for beer. Because Johnny's Grocery did not sell beer, and also because she was frightened, Mildred Collins suggested the two men try another store down the street, which sold both cigarettes and beer. At that point Brown pulled his gun and demanded money. He took all the money in the cash register.

Mildred Collins's husband Joe then entered the front of the store. A scuffle apparently ensued between Brown and Joe Collins. After a shot was fired, Joe Collins fell to the ground. One of the men took Joe Collins's wallet and picked up the gun Brown had carried into the store. Brown and Adams then exited Johnny's Grocery. Joe Collins was dead. According to Rosena Farmer's testimony, the money from the robbery was used to purchase more drugs.

Adams was tried for murder and armed robbery in connection with the incident at Johnny's Grocery. The State's theory of the case as to the murder count was that Brown was the trigger man, but that Adams also was guilty of murder under the "hand of one, hand of all" doctrine. The jury convicted Adams of both murder and armed robbery.

Adams appeals.

## LAW/ANALYSIS

### A. *Evidence of Prior Bad Acts*

Adams asserts the trial judge erred in admitting evidence of Adams's participation in the Circle K robbery and of his crack use on the morning of June 17, 1992. We disagree.

Prior to and at trial, Adams argued that evidence of his

prior bad acts should be excluded pursuant to *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923). The solicitor argued that the evidence of Adams's participation in the Circle K robbery on the same morning of the Johnny's Grocery robbery showed Adams's motive and intent and also demonstrated the existence of a common scheme or plan. The solicitor argued the cocaine use was part of the *res gestae* and showed a motive for the crime. The judge found the evidence of prior bad acts fell within the *Lyle* exceptions raised and held the evidence admissible.

South Carolina law precludes evidence of a defendant's prior crimes or other bad acts to prove the defendant's guilt for the crime charged except to establish (1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan, or (5) identity. *Lyle*, 125 S.C. at 416, 118 S.E. at 807; *accord State v. Bell*, 302 S.C. 18, 393 S.E. (2d) 364, *cert. denied*, 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed. (2d) 182 (1990). The evidence of prior bad acts must be clear and convincing to be admissible. *Lyle*, 125 S.C. at 416, 118 S.E. at 807. Further, even though the evidence is clear and convincing and falls within a *Lyle* exception, the trial judge must exclude it if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *State v. Alexander*, 303 S.C. 377, 401 S.E. (2d) 146 (1991); *see also* Rule 403, SCREvid (recently adopted).

The evidence that Adams participated with Brown in the robbery of the Circle K only half an hour before the robbery and murder at Johnny's Grocery is relevant to show Adams's intent. Adams was not the triggerman in the murder at Johnny's Grocery, but only an alleged accomplice. Therefore, to prove Adams was guilty of murder, the State had the burden of proving beyond a reasonable doubt that Adams combined with Brown to commit an unlawful act—armed robbery—and that homicide was a natural and probable consequence of the act planned. *See, e.g., State v. Johnson*, 291 S.C. 127, 352 S.E. (2d) 480 (1987). Adams's mere presence with Brown at Johnny's Grocery cannot establish Adams's guilt; the prosecution must must prove a combination. *Id.* Stated another way, Adams's *intent* to rob Johnny's Grocery with Brown was a prerequisite to his liability for murder.

The armed robbery of the Circle K that Brown and Adams committed at 5:30 a.m. tends to show that when Adams entered Johnny's Grocery with Brown at 6:00 a.m., only half an hour after the first incident, the two intended to rob the place. *Cf. State v. Simmons*, 310 S.C. 439, 427 S.E. (2d) 175 (1993) (finding evidence of prior attacks on elderly women admissible to show defendant's intent in entering home of elderly woman), *rev'd on other grounds*, — U.S. —, 114 S.Ct. 2187, 129 L.Ed. (2d) 133 (1994); *State v. Hammond*, 270 S.C. 347, 242 S.E. (2d) 411 (1978) (finding that the presence of marijuana in a truck on defendant's property was admissible as relevant to defendant's intent to distribute cocaine). The evidence regarding the Circle K robbery obviously is highly prejudicial. However, its probative value is also high because the evidence tends to establish Adams's intent to combine with Brown to commit armed robbery, which combination is an essential element of murder under the "hand of one, hand of all" doctrine. The trial judge properly admitted this evidence.[1]

The evidence of Adams's cocaine use prior to the robbery and murder at Johnny's Grocery was admissible both to show motive and as part of the *res gestae*. We appreciate the great possibility that unfair prejudice may result from evidence of a criminal defendant's past use of cocaine. In prior cases, therefore, we have been especially careful to ensure that evidence of prior drug use actually falls within one of the exceptions to *Lyle* and that its probative value outweighs the danger of unfair prejudice to the defendant. Although several cases are relevant to this issue generally, three are particularly pertinent to the case before us today.

In *State v. Smith*, 309 S.C. 442, 424 S.E. (2d) 496 (1992), this Court held that the trial court in a capital murder case im-

---

[1] The evidence was clear and convincing. Adams himself made a voluntary statement to the police in which he admitted robbing the Circle K. Rosena Farmer also testified that Adams told her he participated in the robbery of the Circle K. In another statement to the police, Adams indicated only Brown had entered the Circle K. The clerk at the Circle K testified *two* men entered and robbed the store. The mere fact that Adams once denied participation in the Circle K robbery does not mean the evidence cannot be clear and convincing.

Similarly, the evidence of cocaine use on the morning of the robbery and murder was clear and convincing.

properly admitted evidence of the defendant's use of cocaine. The State's theory of the case was that the defendant bludgeoned her husband to death with a baseball bat. At trial, one of the State's witnesses testified that at some time in the past, he and the defendant had obtained cocaine by trading pistols belonging to defendant's husband and that the defendant had in the past left the witness waiting beside the road while she went to get cocaine. *Id.* at 445, 424 S.E. (2d) at 498. On appeal, the State argued the defendant's prior cocaine use was relevant to establish a motive for murder. *Id.* at 446, 424 S.E.(2d) at 498.

This Court disagreed. First, it found that "evidence of drug use is incompetent to establish motive for a crime . . . *where the record does not support any relationship between the crime and the drug use.*" *Id.* (citing *State v. Bolden,* 303 S.C. 41, 398 S.E. (2d) 494 (1990) (emphasis added). The court indicated that where drug use is unrelated to the crime at issue, evidence of the drug use should be excluded. *Id.* at 447, 424 S.E. (2d) at 498. We also rejected the dissent's argument that the evidence of cocaine use was part of the res gestae. In so doing, the Court made special note that "the prior incident of [defendant] smoking cocaine at an unspecified time was certainly not contemporaneous with [victim's] murder." *Id.*

In *State v. Bolden,* 303 S.C. 41, 398 S.E. (2d) 494 (1990), this Court found that the trial court erred in allowing evidence that the defendant smoked crack cocaine that night before he committed an armed robbery. Evidence presented at trial indicated the defendant had checked into a hotel with a woman and had smoked crack cocaine while at the hotel. The next morning he robbed the hotel clerk at gunpoint. We held that there was "nothing in the record to indicate a logical relevance between use of the crack cocaine during the night before the robbery and the robbery which occurred at 6:10 a.m. the next day." *Id.* at 43, 398 S.E. (2d) at 494-95. The Court rejected the argument by the State and the dissent that evidence of defendant's robbery was admissible as part of the *res gestae* of the crime. *Id.* at 43, 398 S.E. (2d) at 495.

Finally, in *State v. Coleman,* 301 S.C. 57, 389 S.E. (2d) 659 (1990), this Court unanimously held the trial court should not have allowed evidence that the defendant was a social user of cocaine. The Court recognized that evidence of prior bad acts

sometimes is admissible, but found that:

> the trial judge abused his discretion and committed legal error in admitting such evidence. While there was testimony that appellant appeared "wired" on the morning of the murder, there was no evidence to suggest appellant's condition was the result of cocaine use. Further, there was nothing in the record to support the inference that the victim and appellant were involved in a drug transaction. Evidence of appellant's social use of cocaine was therefore incompetent to establish . . . a motive for the murder. In fact, the only function of this evidence was to demonstrate appellant's bad character and social irresponsibility. The prejudice to appellant as a result of the admission of this evidence far outweighed its probative value, if any.

*Id.* at 60, 389 S.E. (2d) at 660-61.

The present case can be distinguished easily from ■ *Smith, Bolden,* and *Coleman.* Unlike the evidence in *Smith,* the evidence in the record is competent to show Adams's motive for robbing Johnny's Grocery because *the evidence itself* establishes a relationship between the drug use and the robbery. Specifically, the defendant gave a statement indicating he and Brown robbed the Circle K and "spent the money on rocks, about $60 worth. We smoked what we bought. Pookie [Farmer] came around. She told us about a place [Johnny's Grocery.] She then told us the store we did around 6 a.m. 6/17/92." Rosena Farmer testified that she, Brown, Adams, and some others were "getting high" the morning of June 17, 1992, ant that the money from the robbery of Johnny's Grocery was used to buy "rocks."

Both Adams's statement and Farmer's testimony indicate a logical relevance between the drug use and the robbery. The evidence tends to show that Adams and Brown robbed Johnny's Grocery because they had run out of money to buy crack cocaine. There facts are a far cry from *Bolden* and especially *Coleman,* where there was no direct evidence that the defendants' cocaine use was related to the alleged crimes.

The evidence of Adams's cocaine use immediately prior ■ to the robbery also was properly admitted as part of the *res gestae* of the crimes for which Adams was tried.

*United States v. Masters*, 622 F. (2d) 83, 86 (4th Cir. 1980) (citations omitted), provides a useful analysis:

> One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the 'res gesta' " or the "uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other . . .' [and is thus] part of the res gestae of the crime charged." And where evidence is admissible to provide this "full presentation" of the offense, "[t]here is no reason to fragmentize the event under inquiry" by suppressing parts of the "res gestae."

In *Smith* and *Bolden*, the majority rejected the dissent's arguments that the defendants' prior cocaine use formed part of the *res gesta*. Here, however, the *temporal* proximity of the cocaine use to the robbery and murder is so close that one cannot deny that the cocaine use was so much a part of the "environment" of the crime that omitting the evidence of it would unnecessarily fragmentize the State's case. *See, e.g., State v. Miller*, 260 S.C. 1, 193 S.E. (2d) 802 (1972) (finding that where certain assaults formed part and parcel of the robbery for which defendant was being tried, evidence of the assaults was properly admitted); *State v. Hough*, S.C. —, 459 S.E. (2d) 863 (Ct. App. 1995) (cocaine use not part of the *res gestae* of crime committed where use was not contemporaneous with crime). The use of the cocaine here was inextricably intertwined with the robbery and murder. Under these circumstances, such evidence was properly admitted as part of the *res gestae* of the crime.

## B. *Batson* Issue

Adams next argues that the trial judge erred in quashing the original jury panel after finding the defense exercised its

peremptory strikes in a racially discriminatory manner. We agree, but hold that there is no right of the defendant or of prospective jurors that has not already been vindicated. We find no prejudice and no basis for reversal.

During voir dire, the defense exercised its peremptory challenges upon seven Caucasians. The prosecution requested a hearing pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. (2d) 69 (1986). The judge found a *Batson* violation based on his conclusion that defense counsel's explanations for two of the strikes—that one of the prospective jurors was a court reporter, knew too much about the process, and looked "too intelligent," and that another prospective juror knew the trial judge—were not racially neutral.

To date, we have interpreted *Batson* to require the party that exercised the peremptory challenges at issue to present an explanation that is racially neutral, clear and reasonably specific, and legitimate, *E.g., State v. Tomlin*, 299 S.C. 294, 384 S.E. (2d) 707 (1989); *see also State v. Green*, 306 S.C. 94, 409 S.E. (2d) 785 (1991) (articulating test), *cert. denied*, 503 U.S. 962, 112 S.Ct. 1566, 118 L.Ed. (2d) 212 (1992). If the explanation does not satisfy these criteria, the trial judge may find a violation and throw out the jury panel. If, however, the explanation meets these criteria, the opponent of the strike then bears the burden of proving that the allegedly neutral explanation is pretextual. *E.g., Sumpter v. State*, 312 S.C. 221, 439 S.E. (2d) 842 (1994). Generally, one shows pretext by demonstrating that similarly situated jurors of other races were seated. *Id.* Moreover, the trial court's findings regarding purposeful discrimination are entitled to great deference and are to be set aside only if clearly erroneous. *State v. Dyar*, 317 S.C. 77, 452 S.E. (2d) 603 (1994).

Recently, however, in *Purkett v. Elem*, — U.S. —, 115 S.Ct. 1769, 131 L.Ed. (2d) 834 (1995), the United States Supreme Court adopted a slightly altered procedure for the second step of the *Batson* analysis. Under *Purkett*, the proponent of the peremptory challenges will not have any burden of presenting reasonably specific, legitimate explanations for the strikes. Instead, it need only present racially neutral explanation:

> The second step of this process does not demand an explanation that is persuasive, or even plausible. . . . It is

not until the third step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step 3 is quite different from saying that a trial judge must terminate the inquiry at step 2 when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

*Id.* at —, 115 S.Ct. at 1771, 131 L.Ed. (2d) at 839 (citations omitted). Once a racially neutral explanation is given, the party challenging the strikes must show the explanation is mere pretext for racial discrimination. *Id.*

We take this opportunity to adopt the standard delineated in *Purkett*. Under this new test, the party opposing the strikes will make a case of prima facie discrimination in the same manner as before. In other words, pursuant to *State v. Jones*, 293 S.C. 54, 358 S.E. (2d) 701 (1987), the trial judge must hold a *Batson* hearing when members of a cognizable racial group or gender are struck and the opposing party requests a hearing. The second step of the analysis, however, will require only a race-neutral explanation by the proponent of the strike. In the third step, the opponent of the strike must show that the race-neutral explanation given was mere pretext. As before, pretext generally will be established by showing that similarly situated members of another race were seated on the jury. *See Sumpter v. State*, 312 S.C. 221, 439 S.E. (2d) 842 (1994). Under some circumstances, the race-neutral explanation given by the proponent may be so fundamentally implausible that the judge may determine, at the third step of the analysis, that the explanation was mere pretext even without a showing of disparate treatment. We note that this new test does not vitiate *Batson*, because we retain our current approach to the first and third prongs of the *Batson* analysis. The *Purkett* approach simply returns to the opponent of the strike the ultimate burden of showing purposeful discrimination.

No matter which test is used, the trial judge in the present case erred in finding a violation of *Batson*. The judge found that the explanations given by defense counsel—that one juror was a court reporter and looked "too intelligent," and that another juror knew the judge—were not racially neutral. These explanations are racially neutral, legitimate reasons for exercising peremptory strikes. A potential juror's acquaintance with the trial judge is a perfectly valid explanation for the exercise of a peremptory strike. The explanation that one juror looked "too intelligent" could be viewed as suspect but for the fact that the *primary* explanation given for the strike was the the potential juror was employed as a court reporter and may have known "too much" about judicial process. Under out past precedents, the judge should have found these reasons racially neutral and legitimate and allowed the prosecution an opportunity to show that the explanations were pretextual. Under the new *Purkett* standard, the judge also should have allowed the inquiry to proceed to the third step, because the explanations given were facially race-neutral.

The Record contains very little information that would allow this Court to determine whether defense counsel allowed to be seated black jurors who were similarly situated to the white jurors who were struck. The Record lacks this information because the trial judge did not allow the *Batson* hearing to proceed to the third stage. Without more information in the Record, we conclude that the trial court erred in finding a *Batson* violation and in quashing the original jury.

Nevertheless, we do not reverse based on this error. We have not yet ruled on the proper remedy for a trial judge's error in *finding* a *Batson* violation and quashing the jury. This situation is fundamentally different from one in which the trial judge improperly upholds racially discriminatory peremptory challenges. When the trial court improperly upholds such challenges, there has been a violation of the stricken jurors' Fourteenth Amendment equal protection rights. Additionally, if the prosecution is the party improperly exercising peremptory challenges that the trial judge upholds, the defendant has been denied a right to a fair and impartial jury of his peers.

However, where, as here, the trial judge *improperly*

quashes a jury panel, no juror's equal protection rights have been violated. An appellate determination that a judge erred in finding a *Batson* violation means the obvious: No *Batson* violation occurred, and there was, therefore, no denial of anyone's equal protection rights. Moreover, we see no way in which the defendant's fair trial rights were violated.[2] A defendant has no right to trial by any particular jury. *E.g., State v. Caldwell*, 300 S.C. 494, 388 S.E. (2d) 816 (1990). When the trial judge quashed the first jury panel, the parties selected a new jury. Adams has voiced no complaints about the new jury. We find that no prejudice resulted from the judge's error.

### C. *Instruction on Reasonable Doubt*

At trial, Adams requested a jury instruction that reasonable doubt "is the kind of doubt that would cause a reasonable person to hesitate to act." *See State v. Manning*, 305 S.C. 413, 409 S.C. (2d) 372 (1991) (defining reasonable doubt), *cert. denied*, 503 U.S. 914, 112 S.Ct. 1282, 117 L.Ed. (2d) 507 (1992). The trial judge refused to define reasonable doubt. Adams does not argue the reasonable doubt charge given by the judge was incorrect or misleading, but asserts the refusal to give the *Manning* definition constituted legal error. Adams's argument is manifestly without merit. *See State v. Johnson*, 315 S.C. 485, 445 S.E. (2d) 637 (1994) (trial judge did not err in refusing to offer a definition of reasonable doubt).

### CONCLUSION

For the foregoing reasons, the judgment of the trial court is AFFIRMED.

MOORE, WALLER and BURNETT, JJ., concur.

FINNEY, C.J., specially concurring in separate opinion.

FINNEY, Chief Justice:

---

[2] Our opinion on this matter might be different were there evidence that the jury ultimately selected for the case had on it any of the persons that defense counsel struck from the first jury panel. *See State v. Franklin*, 318 S.C. 47, 456 S.E. (2d) 357 (when trial judge properly finds *Batson* violation and original panel quashed, no error for judge to require seating of improperly stricken jurors from first panel), *cert. denied*, — U.S. —, 116 S.Ct. 160, 133 L.Ed. (2d) 103 (1995).

I agree appellant's conviction should be affirmed, but unlike the majority I would not alter our well-settled *Batson* procedure to conform to the United States Supreme Court's decision in *Purkett v. Elem*, — U.S. —, 115 S.Ct. 1769, 131 L.Ed. (2d) 834 (1995). In my opinion, if a party offers "implausible" or "fantastic" explanations for its challenged strikes, the *Batson* motion should be granted at that point. Webster's New Collegiate Dictionary defines implausible as "provoking disbelief" and fantastic as "based on fantasy: not real." I would not require the party asserting the *Batson* challenge to demonstrate disparate treatment where the explanation given is patently unbelievable. For this reason, I concur only in the result here.