108

749 S.E.2d 160

The STATE, Respondent,

v.

Dondre SCOTT, Appellant.

Appellate Case No. 2010–170047.

No. 5174.

Court of Appeals of South Carolina.

Heard June 4, 2013.
Decided Oct. 2, 2013.

110

Robert M. Dudek, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Salley W. Elliott, Senior Assistant Attorney General W. Edgar Salter, III, all of Columbia; and Solicitor Edgar Lewis Clements, III, of Florence, for Respondent.

GEATHERS, J.

Appellant Dondre Scott appeals his convictions for murder, armed robbery, and possession of a weapon during the commission of a violent crime. Scott argues the trial court erred in granting the State's *Batson*[1] motion and quashing the first jury selected. We reverse and remand for a new trial.

## FACTS/PROCEDURAL HISTORY

On October 1, 2009, Scott and his co-defendant, Sylvester Davis, Jr., were indicted by a Florence County Grand Jury for murder, armed robbery, and possession of a weapon during the commission of a violent crime. Jury selection began on August 9, 2010. During the initial jury selection, Scott, who is black, exercised peremptory strikes on eight prospective white jurors.[2] After the jury was selected,[3] the State requested a *Batson* hearing, asserting the defense struck only white jurors. The trial court ultimately found Scott's reasons for striking Jurors 72 and 191 were pretextual. The trial court quashed the first jury, and a new jury was selected. Juror 72 was selected for the second jury. Because only Juror 72 served on the jury that convicted Scott, this appeal is limited to Juror 72.

At the *Batson* hearing, Scott's defense counsel explained that he struck Juror 72 because he was a warehouse manager whose "employment related to supervising and overseeing."

---

1. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

2. Scott exercised peremptory challenges against three white males and five white females, one of whom was a potential alternate.

3. The jury was ultimately composed of six black females, three black males, two white females, and one white male. The alternates were one white female and one black male.

Concerning the employment of Juror 72, defense counsel stated that he "did not feel comfortable with someone who holds [that] position of authority being on this particular jury." In response, the State argued that the strike was mere pretext because several similarly situated black jurors were seated on the jury. The State noted that Juror 80, a black female who was a stock room manager for Rose's Department Store, was seated on the jury. Additionally, the State argued, "there were several teachers and substitute teachers that [sic] were seated that [sic] were African–American and they certainly have supervisory capacity over people for sure."

In rebuttal, defense counsel challenged the State's portrayal of teachers as supervisors. Defense counsel asserted a teacher could not be categorized as a supervisor because, "[t]here's less than any supervision in most school rooms these days. But be that as it may, it's not the same as supervising adults and I never thought of a teacher as being a supervisor. I thought of them as being a teacher." Additionally, defense counsel explained that he seated Juror 80, in spite of her employment in a managerial position, because he had mistakenly written down that she worked in "home sales." In response, the trial judge stated that the employment information of each juror had been announced in open court. Defense counsel reiterated, "I heard something different than what everyone else heard apparently because I wrote home sales down." The trial judge accepted defense counsel's explanation, observing, "I do not doubt you at all, at all. And you know what, I'm looking at my list, juror number 80 … I wrote down [she worked in] health sales."

Although the trial judge accepted defense counsel's explanation that the seating of Juror 80 was a mistake, he expressed concern that the seating of several black jurors who were teachers was evidence of purposeful discrimination. Specifically, the trial judge shared his own belief that teachers could be categorized as supervisors, stating the following, "I don't think there's anyone more in a managerial position or a position of authority than a teacher and a professor at Francis Marion who is one of our jurors." Accordingly, the trial judge granted the State's *Batson* motion as to Juror 72, finding that the excluded white venire panelist who was employed as a

warehouse manager was similarly situated to seated black jurors who were employed as teachers.

The jury found Scott guilty of murder, armed robbery, and possession of a weapon during the commission of a violent crime. The trial court sentenced Scott to life imprisonment for the murder charge, thirty years' imprisonment for the armed robbery charge, and five years' imprisonment for the possession of a weapon during the commission of a violent crime charge. This appeal followed.

## STANDARD OF REVIEW

"Whether a *Batson* violation has occurred must be determined by examining the totality of the facts and circumstances in the record." *State v. Shuler*, 344 S.C. 604, 615, 545 S.E.2d 805, 810 (2001). "Appellate courts give the trial judge's finding great deference on appeal, and review the trial judge's ruling with a clearly erroneous standard." *Id.* "A finding is clearly erroneous if it is not supported by the record." *Id.* at 620, 545 S.E.2d at 813.

## LAW/ANALYSIS

Scott contends the trial court erred in finding his reason for striking Juror 72, a white juror who worked as a warehouse manager, was pretext for purposeful racial discrimination on the ground that similarly situated black jurors were seated on the jury. Specifically, Scott argues the trial court erred in finding that several seated black jurors who were employed as teachers were similarly situated to Juror 72. We agree.

"The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the striking of a venire person on the basis of race or gender." *Id.* at 615, 545 S.E.2d at 810. "The purposes of *Batson* and its progeny are to protect the defendant's right to a fair trial by a jury of the defendant's peers, protect each venireperson's [sic] right not to be excluded from jury service for discriminatory reasons, and preserve public confidence in the fairness of our system of justice by seeking to eradicate discrimination in the jury selection process." *State v. Haigler*, 334 S.C. 623, 628–29, 515 S.E.2d 88, 90 (1999) (citations omitted). "When one party strikes a member of a cognizable racial group or gender, the trial court must hold a *Batson* hearing if the opposing

party requests one." *Shuler,* 344 S.C. at 615, 545 S.E.2d at 810.

In *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), the Supreme Court of the United States explained the proper procedure for a *Batson* hearing as follows:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

Step two of this process does not demand an explanation that is persuasive or even plausible. *State v. Cochran,* 369 S.C. 308, 314, 631 S.E.2d 294, 298 (Ct.App.2006) (quoting *Purkett,* 514 U.S. at 767–68, 115 S.Ct. 1769). At step two, "the proponent of the strike does not carry 'any burden of presenting reasonably specific, legitimate explanations for the strikes.'" *Id.* (quoting *State v. Adams,* 322 S.C. 114, 123, 470 S.E.2d 366, 371 (1996)). "Therefore, '[u]nless a discriminatory intent is inherent' in the explanation provided by the proponent of the strike, 'the reason offered will be deemed race neutral' and the trial court must proceed to the third step of the *Batson* process." *Id.* (quoting *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769).

"At step three, the opponent of the strike must show the reason offered, though facially race-neutral, was actually mere pretext to engage in purposeful racial discrimination." *Cochran,* 369 S.C. at 315, 631 S.E.2d at 298 (citing *Adams,* 322 S.C. at 124, 470 S.E.2d at 372). "The burden of persuading the court that a *Batson* violation has occurred remains at all times on the opponent of the strike." *Haigler,* 334 S.C. at 629, 515 S.E.2d at 91. "This burden is generally established by showing similarly situated members of another race were seated on the jury." *Cochran,* 369 S.C. at 315, 631 S.E.2d at 298. "When the opponent of the strike proves the proponent of the strike practiced purposeful racial discrimination, the trial court must quash the entire jury panel and

initiate another jury selection de novo." *Cochran,* 369 S.C. at 315, 631 S.E.2d at 298.

For the purpose of demonstrating potential jurors are similarly situated under *Batson,* potential jurors are not required to be "identical in all respects." *Miller–El v. Dretke,* 545 U.S. 231, 247 n. 6, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) ("A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters."). Rather, the potential jurors need only be alike " 'in all relevant aspects.' " *Startzell v. City of Philadelphia,* 533 F.3d 183, 203 (3d Cir.2008) (quoting *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992)). Therefore, in determining whether potential jurors are similarly situated, our courts have focused their inquiry on whether there are meaningful distinctions between the individuals compared. *See State v. McCray,* 332 S.C. 536, 540–41, 506 S.E.2d 301, 302–03 (1998) (finding three white jurors who were seated on the jury were not similarly situated to four black jurors who were struck from the jury because "[t]he white jurors did not have the same relationship to law enforcement as the black jurors" when the black jurors had relatives or friends who, at the time of the trial, were employed in law enforcement, and the relatives or friends of the white jurors were no longer employed in law enforcement); *State v. Williams,* 379 S.C. 399, 401–02, 665 S.E.2d 228, 230 (Ct.App. 2008) (holding the trial court erred in finding an unemployed *juror* was similarly situated to an employed juror whose *spouse* was unemployed).

There are sufficient distinctions between a teacher and a warehouse manager. *Cf. United States v. Davis,* 154 F.3d 772, 781 (8th Cir.1998) (finding there was a sufficient distinction between the challenged juror who worked as a drug counselor and several seated jurors who worked as drug prevention volunteers to defeat a *Batson* challenge). The duties of a teacher are common knowledge. A teaching position involves some supervisory and management skills; particularly, a teacher exercises authority over other individuals—his or her students. However, a teaching position, in

itself, is not a management or supervisory position.[4] There is a stark difference in the degree of authority exercised by a teacher and a manager. Specifically, defense counsel pointed out at trial that a warehouse manager has the ability to hire, fire, or demote other adult co-workers. A teacher does not share these characteristics.[5] Because of the significant distinctions between these two types of employment, we find the trial court erred in finding that a black professor and several black teachers who were seated on the jury were similarly situated to Juror 72, a white warehouse manager.

Furthermore, the State argues as an additional sustaining ground that the seating of Juror 80, a black female who was employed as a stockroom manager at Rose's Department Store, established that Scott's stated reason for striking Juror 72, a warehouse manager, was pretext for racial discrimination. We find this argument is without merit. In this instance, the trial judge found that Scott's defense counsel provided a facially valid explanation for inconsistently applying his stated reason—that he mistakenly wrote down that Juror 80 worked in home sales. Specifically, the trial judge stated, "I do not doubt you at all, at all. And you know what, I'm looking at my list, juror number 80 . . . I wrote down [she worked in] health sales." *See State v. Kelley*, 319 S.C. 173, 176–77, 460 S.E.2d 368, 369–70 (1995) (holding the solicitor provided a race-neutral explanation for why he did not strike a juror with similar characteristics to a juror previously stricken); *State v. Casey*, 325 S.C. 447, 454, 481 S.E.2d 169, 173

---

4. The Supreme Court of the United States recently held that under the National Labor Relations Act, a supervisor is any individual with the authority to make "tangible employment actions" that effect a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Vance v. Ball State Univ.*, —— U.S. ——, 133 S.Ct. 2434, 2443, 186 L.Ed.2d 565 (2013) (citation omitted).

5. Our analysis in this case is limited to discerning differences between a warehouse manager and teachers in general. We recognize there may be certain instances where an individual employed as a teacher exercises a similar level of control over co-workers as does a warehouse manager. However, in this instance, the record does not indicate the degree of supervisory responsibilities that the seated professor or teachers had.

(Ct.App.1997) (stating that "the uneven application of a neutral reason does not automatically result in a finding of invidious discrimination if the strike's proponent provides a race or gender neutral explanation for the inconsistency"); *id.* (holding that although the solicitor did not challenge a female juror with prior jury service yet struck a male juror with prior service, and thus the reason for striking the juror was applied inconsistently, the solicitor's explanation that it was merely an omission and mistake on his part was gender-neutral). Therefore, in the instant matter, the trial judge granted the State's *Batson* motion in connection with Juror 72 not because of the strike of Juror 80, but *solely* on the ground that defense counsel did not strike jurors who were employed as teachers whom the trial judge deemed similarly situated to a warehouse manager.

## CONCLUSION

Because the trial court improperly granted the State's *Batson* motion as to Juror 72 and Juror 72 was seated on the second jury, Scott was denied his right to exercise his peremptory challenges. Therefore, we remand this case for a new trial.[6] *See Edwards,* 384 S.C. at 509, 682 S.E.2d at 823 (holding if a trial court improperly grants the State's *Batson* motion and one of the disputed jurors is seated on the jury, then the erroneous *Batson* ruling has tainted the jury and prejudice is presumed because there is no way to determine with any degree of certainty whether a defendant's right to a fair trial by an impartial jury was abridged, and the proper remedy in such a case is a new trial). Accordingly, the decision of the trial court is

**REVERSED AND REMANDED.**

FEW, C.J., and LOCKEMY, J., concur.

---

6. Because we reverse and remand this matter to the trial court, we need not consider Rogers' remaining sentencing issue. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (stating an appellate court need not address remaining issues when resolution of a prior issue is dispositive).