535 S.E.2d 119

**The STATE, Respondent,**

v.

**William Oliver DICKERSON, Appellant.**

No. 25164.

Supreme Court of South Carolina.

Heard May 24, 2000.

Decided July 3, 2000.

Assistant Appellate Defender Robert M. Dudek, of South Carolina Office of Appellate Defense, of Columbia, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General G. Robert Deloach, III, all of Columbia; and Solicitor David P. Schwacke, of North Charleston, for respondent.

TOAL, Chief Justice:

William Oliver Dickerson ("defendant") was convicted of murdering Mary Middleton ("victim"). Defendant appeals. We affirm.

### FACTUAL/PROCEDURAL BACKGROUND

Victim was last seen alive on the evening of May 31, 1996, in her Charleston home. She was 83 years old and lived by herself. Around 8:00 p.m. that evening, victim went next door to tell Chrisaundra Lockwood, her neighbor, that she had a telephone call at her house. Lockwood did not have a phone of her own so victim allowed her to take calls on her line. On the way back to her house, victim told Lockwood that she was talking in the backyard with a man who had gone to school with her son, but who she did not remember. While in the house, Lockwood observed victim talking in the backyard to a man in a green hospital shirt, which resembled a doctor's shirt. When Lockwood left the house after the call, victim was still talking to the man.

At this same time, another one of victim's neighbors, Quinnie Gailliard, observed victim in her backyard talking with an man she recognized as the defendant. She even asked her

husband at the time if he thought it was defendant talking to victim. Husband disagreed with her at the time that the man was defendant. Gailliard testified the man was standing near victim's car in the backyard, looking at some damage to the vehicle.

Around 8:30 p.m. that evening, a few blocks away from victim's house, defendant approached Willie Gibbs, a friend defendant had grown up with, and asked him for a ride into the city. Once in the car, defendant asked Gibbs to take him to MUSC so he could get a key from his girlfriend, Sandra Jenkins, in order to change clothes. Gibbs refused and defendant told him that he needed to change clothes because he and a friend had just killed a man in Mt. Pleasant. Defendant showed Gibbs that he had turned his pants inside out to cover up the blood. In the car, Gibbs could see defendant's pants legs were covered in blood. Defendant and Gibbs got into an argument and defendant got out of the car.

Soon after 11:00 p.m. that night, defendant knocked on Sandra Jenkins' door. When she let him in the apartment, defendant was wearing a green hospital shirt and his pants on inside out. Even though the pants were reversed, Jenkins testified she could tell they were covered in blood. Defendant told Jenkins that he had been in a truck with a man and his girlfriend and the man had repeatedly stabbed the girlfriend and he did not know if she was alive or dead.

Jenkins was scared and asked defendant to leave. Defendant refused to leave and emptied his pockets onto her coffee table. In addition to a small amount of money, defendant also put a broach on the table that "somebody would wear to church." Defendant then showered and put on some clothes that belonged to Jenkins' son. He rolled up the green hospital scrub top and bloody pants and took them with him when he left.

The next morning, victim's neighbors became concerned when she did not get her morning paper or open up her windows. Eventually one of the neighbors entered the house. Victim was found dead on the floor with her body naked from the waist down. The house had been ransacked. The neighbors called the police who arrived at the scene around 2:30 p.m. on June 1, 1996.

The police found no signs of forced entry into the house. Victim had suffered 25 separate stab wounds on her head and neck, causing her to bleed to death. Two of the stab wounds had pierced victim's carotid artery and jugular vein, both were fatal injuries. The medical examiner estimated the time of death at around 8:00 p.m. the previous evening.

The medical examiner characterized the victim's death as an "overkill" murder. According to the medical examiner, "overkill" occurs when the murderer inflicts injuries much more severe than necessary to cause death. The medical examiner testified that she had only encountered "overkill" murders as the result of a lovers' quarrel or when the killer had been high on drugs like cocaine. She also testified that expert literature on the subject of "overkill" murders reports that such killings often occur when the killer is high on drugs or motivated to kill by sexual passion.

Investigators at the crime scene found defendant's fingerprints all over the inside of victim's house and on her belongings. Fingerprints were on a magazine in the living room, on one of victim's purses, on victim's dresser, on a plastic bag, and on a jewelry box in victim's bedroom. The purse and jewelry box covered with defendant's fingerprints had been emptied onto victim's bed. The police also found defendant's fingerprints on the car in victim's backyard where Gailliard had testified that victim and the man were standing shortly before the murder.

Two days after the murder the police arrested defendant. On the day of the murder, defendant had been living with his brother in a house located on the street directly behind victim's house. Defendant had grown up in the neighborhood and attended school with victim's son. He also told the police that he had never been inside victim's house before. When arrested, defendant voluntarily gave the following sworn statement to the police:

On Friday, which is May 31st, 1996, about 9:00 a.m. I went and picked up Lee in Ashleyville. We went to Mimi's house in Shadowmoss to clean the garage. I came back to the area of the Hess Gas Station on Highway 61 about 5:00 or 6:00 p.m. and caught a rid [sic] to the North Area.

In the North Area, I got a bag of cocaine and a bag of heroin. I got high on Arbutus Street in the Height. I caught a ride back into Charleston and went to the same Hess Station and bought a quart of Old English Beer. This was about 1:00 a.m. I then walked back to Armstrong Avenue and crawled through the window of my brother's house and went to sleep.

I got up around 8:00 or 9:00 a.m. Saturday morning. I caught a ride to Tony's Auto Repair on Highway 61 to check on my car and then to Shadowmoss. I then left Shadowmoss, and I went to the North Area again and got high. I came back to Armstrong Avenue again about 1:00 a.m. Sunday. Gopher took me to Tony's and then to Shadowmoss.[1]

At trial, defendant did not challenge the voluntariness of the statement, but moved to redact the references to his drug use. The judge allowed the entire statement to be read to the jury without any redactions. The jury convicted defendant and he has appealed. The issue before the Court is:

Did the trial judge err in allowing evidence of defendant's drug use during the time frame in which the murder took place to be presented to the jury?

## LAW/ANALYSIS

Defendant argues the trial court erred by not redacting, as improper evidence of prior bad acts, admissions of drug use contained in his statement to the police. We disagree.

■ Defendant's admitted drug use during the time period of the murder is not improper character evidence because it was not being used to show a criminal propensity. It was introduced to identify defendant as the murderer. South Carolina law precludes evidence of a defendant's prior bad acts to prove the defendant's guilt for the crime charged except to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan; or (5) the identity of the perpetrator. Rule 404(b), SCRE; *see also* *State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999); *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923). In the current case,

1. Arbutus Street is in a part of North Charleston.

the State argues defendant's confessed cocaine use during the time in which the murder occurred serves to establish his identity as the killer because the medical expert testified that cocaine use is one of the two main causes of "overkill" murders such as victim's.[2]

 This Court has addressed several times the admissibility of evidence of a defendant's drug use under *State v. Lyle*, 125 S.C. 406, 118 S.E. 803 (1923) during the trial of another crime. *See State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999); *State v. Hough*, 325 S.C. 88, 480 S.E.2d 77 (1997); *State v. Adams*, 322 S.C. 114, 470 S.E.2d 366 (1996); *State v. Smith*, 309 S.C. 442, 424 S.E.2d 496 (1992); *State v. Bolden*, 303 S.C. 41, 398 S.E.2d 494 (1990); *State v. Coleman*, 301 S.C. 57, 389 S.E.2d 659 (1990). These cases stand for the general proposition that, in order to be admissible, the drug use must have some relevant connection to the crime charged. *See State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999)("The record must support a logical relevance between the prior bad act and the crime for which the defendant is accused."). In the current matter, defendant's drug use is admissible because the testimony of the medical examiner connects it to the violent "overkill" nature of the murder. Thus it serves to identify defendant as the "overkill" murderer.

In *State v. Smith*, 309 S.C. 442, 424 S.E.2d 496 (1992), this Court held the trial court erred by admitting evidence of the defendant's use of cocaine. At trial, one of the State's witnesses testified that at some time in the past, he and the defendant had obtained cocaine by trading stolen goods and that the defendant had in the past left the witness waiting beside the road while she went to get cocaine. *Id.* at 445, 424 S.E.2d at 498. On appeal, the State argued the defendant's prior cocaine use was relevant to establish a motive for murder. *Id.* at 446, 424 S.E.2d at 498. The Court found that "evidence of drug use is incompetent to establish motive for a crime ... where the record does not support any relationship between the crime and the drug use." *Id.* The Court indicat-

---

**2.** At trial the State argued: "The medical examiner will testify about the overkill, your Honor, as far as the multiple stab wounds to the head. That certainly could be something that would be viewed as while under the influence of drugs or certainly heroin."

ed that where drug use is unrelated to the crime at issue, evidence of the drug use should be excluded. *Id.* at 447, 424 S.E.2d at 498. In noting the time lapse between the drug use and the murder, the Court stated that "the prior incident of [defendant] smoking cocaine at an unspecified time was certainly not contemporaneous with [victim's] murder." *Id.* The current case is distinguishable from *Smith* because defendant admits in his statement to being high on cocaine during the actual time period in which the murder took place.

In *State v. Bolden,* 303 S.C. 41, 398 S.E.2d 494 (1990), this Court found error in admitting evidence that the defendant smoked crack cocaine the night before he committed an armed robbery. Evidence presented at trial indicated the defendant had checked into a hotel with a woman and had smoked crack cocaine while at the hotel. The next morning he robbed the hotel clerk at gunpoint. The Court held that there was "nothing in the record to indicate a logical relevance between use of the crack cocaine during the night before the robbery and the robbery which occurred at 6:10 a.m. the next day." *Id.* at 43, 398 S.E.2d at 494–95. The current case is distinguishable from *Bolden* because the medical expert testified cocaine use was a probable source of the "overkill" nature of the murder.

In *State v. Coleman,* 301 S.C. 57, 389 S.E.2d 659 (1990), this Court held the trial court should not have allowed into evidence that the defendant was a social user of cocaine. The Court recognized that evidence of prior bad acts sometimes is admissible, but found that:

> While there was testimony that appellant appeared "wired" on the morning of the murder, there was no evidence to suggest appellant's condition was the result of cocaine use. Further, there was nothing in the record to support the inference that the victim and appellant were involved in a drug transaction. Evidence of appellant's social use of cocaine was therefore incompetent to establish . . . a motive for the murder. In fact, the only function of this evidence was to demonstrate appellant's bad character and social irresponsibility. The prejudice to appellant as a result of the admission of this evidence far outweighed its probative value, if any.

*Id.* at 60, 389 S.E.2d at 660–61. Unlike *Coleman,* identity is at issue in the current case and defendant's drug use was not used to attack his character, but to help identify him as the probable killer. Furthermore, the defendant voluntarily admitted to the police that he was high on drugs during the time frame in which the murder took place.

In *State v. Hough,* 325 S.C. 88, 480 S.E.2d 77 (1997), this Court held the fact that the defendant had previously, on unspecified occasions, done crack cocaine or previously stolen to obtain money for crack does not demonstrate a motive for the alleged robbery on trial. On the contrary, such evidence would only serve to demonstrate that the defendant acted in conformity with a propensity to commit crimes. Unlike *Hough,* in this case the State argues defendant's admitted drug use was contemporaneous with the crime on trial and the State argues it had an integral role in how the murder was committed.

The testimony of the expert witness supports a logical relevance between defendant's confessed drug use and the murder for which he is accused. The expert testified:

> There are really two main situations that the literature cites and that I have also seen in my experience that you find overkill. One of them is an individual when they know the person, lover's quarrel ... And the second situation is when the assailant is high on drugs, a stimulant such as cocaine. They're just really going at it because they are under the influence of the drug. They are the two situations where we see overkill.

By introducing evidence of defendant's cocaine use during the time frame in which the murder occurred and the testimony of the medical examiner regarding "overkill" murders, the State can show the defendant would be in the state of mind to commit an "overkill" murder. In this case, evidence of defendant's cocaine use would serve to identify him as victim's killer.

The evidence of defendant's cocaine use also meets the standard of clear and convincing evidence. "The evidence of the prior bad acts must be clear and convincing to be admissible." *State v. Adams,* 322 S.C. 114, 470 S.E.2d 366 (1996). Defendant freely admitted his drug use during the

time frame of the murder in his voluntary statement to the police. This evidence satisfies the clear and convincing standard.

Furthermore, we find the evidence of defendant's drug use has probative value that outweighs any prejudicial effect. "[E]ven though the evidence is clear and convincing and falls within a *Lyle* exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *See* Rule 403, SCRE. Unfair prejudice means an undue tendency to suggest decision on an improper basis. *State v. Alexander*, 303 S.C. 377, 401 S.E.2d 146 (1991). "The determination of the prejudicial effect of prior bad act evidence must be based on the entire record and the result will generally turn on the facts of each case." *State v. Forney*, 321 S.C. 353, 358, 468 S.E.2d 641, 644 (1996).

Here, the prior bad act was not introduced to show a propensity for that type of crime. The State did not argue the evidence that defendant committed a similar crime in the past meant he would be more likely to commit the same crime again. *See, e.g., State v. Hough*, 325 S.C. 88, 480 S.E.2d 77 (1997). As a result, we believe the trial judge did not abuse his discretion in finding the probative value of the defendant's prior bad act was not substantially outweighed by the danger of unfair prejudice.

Although not argued by the State, the evidence of defendant's drug use in this case would also be admissible under the theory of *res gestae*. As stated in *State v. Adams*, 322 S.C. 114, 122, 470 S.E.2d 366, 371 (1996):

Here ... the temporal proximity of the cocaine use to the robbery and murder is so close that one cannot deny that the cocaine use was so much a part of the "environment" of the crime that omitting the evidence of it would unnecessarily fragmentize the State's case.... The use of the cocaine here was inextricably intertwined with the robbery and murder. Under these circumstances, such evidence was properly admitted as part of the res gestae of the crime.

In addition to finding the drug use evidence admissible under the theory of *res gestae*, the *Adams* court also found the evidence was properly admitted under *Lyle*. We believe the

evidence of defendant's cocaine use in the current case would also be admissible on each basis.

## CONCLUSION

Based on the foregoing, we **AFFIRM** defendant's conviction.

MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.