552 S.E.2d 745

**The STATE, Respondent,**

v.

**Freddie Eugene OWENS, Appellant.**

**No. 25354.**

Supreme Court of South Carolina.

Heard May 9, 2001.

Decided Sept. 4, 2001.

Rehearing Denied Oct. 10, 2001.

638

Assistant Appellate Defender Katherine Carruth Link, of South Carolina Office of Appellate Defense, of Columbia; John M. Rollins, Jr., of Greer; and Karl B. Allen, of Greenville, for appellant.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General Tracey C. Green, of Columbia; and Solicitor Robert M. Ariail, of Greenville, for respondent.

BURNETT, Justice:

Appellant was convicted of murder, armed robbery, use of a firearm in the commission of a violent crime, and.conspiracy to commit armed robbery. He was sentenced to death for murder and imprisonment for thirty years, five years, and five years for armed robbery, use of a firearm in the commission of a violent crime, and conspiracy to commit armed robbery, respectively.

## ISSUES

I. Did the trial court have subject matter jurisdiction to try appellant for murder?

II. Did the trial court err by admitting evidence of appellant's prior bad acts?

III. Did the trial court err by admitting appellant's February 16th statement because the statement did not meet the requirements of South Carolina Code Ann. § 16–3–20(B) (Supp.2000)?

IV. Did the trial court err by admitting appellant's February 16 [th] statement because it was obtained in violation of his Fifth Amendment right to counsel?

V. Did the trial court err by admitting appellant's February 16 [th] statement because it was obtained in violation of his Sixth Amendment right to counsel?

VI. Did the trial court violate appellant's due process and Eighth Amendment rights, along with Rule 403, SCRE, by admitting his February 16th statement?

VII. Did the trial court err by denying appellant's motion for a new sentencing proceeding based on after-discovered evidence?

VIII. Did the trial court err by sentencing appellant for possession of a firearm during the commission of a violent crime?

## BACKGROUND

The charges against appellant stem from the 4:00 a.m. November 1, 1997, armed robbery of a Speedway convenience store and fatal shooting of the store's clerk, Irene Graves. Appellant was jointly tried with co-defendant Stephen Andra Golden. During jury qualification, Golden pled guilty.

During trial, the State introduced the Speedway security video which recorded the robbery and shooting. The video reveals two individuals entered the store. One individual shot Graves.

Golden admitted he was one of the Speedway robbers and claimed appellant was his accomplice. He testified appellant shot Graves in the head after she stated she could not open

the safe. No forensic evidence connected appellant to the crime scene.

Nakeo Vance testified he, Golden, appellant, and Lester Young planned to rob the Speedway and, simultaneously, a nearby Waffle House. Golden and appellant robbed the Speedway. Vance and Young went to the Waffle House but did not carry out the robbery. After the Speedway shooting and robbery, Vance testified appellant admitted he shot the store clerk.

Appellant's girlfriend testified appellant told her he had robbed a store and shot the clerk.

Detective Wood and Investigator Willis testified appellant initially gave a written statement denying involvement in the Speedway robbery and shooting. According to both witnesses, appellant later admitted he shot Graves.

Appellant maintained he was at home in bed at the time of the Speedway robbery and shooting.[1] He suggested the Sheriff's Department's investigation into the identity of Golden's accomplice was inadequate. For instance, he asserted the Sheriff's Department initially interviewed another individual who tested positive for gun powder residue, but failed to pursue this individual as a suspect. Alternatively, he suggested Vance was the accomplice. Appellant intimated witnesses who testified against him had various reasons to inculpate him in the crime. He also suggested witnesses falsely testified he made statements admitting he robbed the Speedway and shot the store clerk. Additionally, he claimed the Sheriff's Department intimidated his mother into giving a written statement in which she asserted appellant admitted shooting the clerk. Appellant's mother denied giving the statement.

## I.

Appellant argues the trial court lacked subject matter jurisdiction to try him for murder because the murder indictment failed to allege malice aforethought as required by South Carolina Code Ann. § 17–19–30 (1985). We disagree.

---

1. Appellant's alibi was offered through the testimony of a Sheriff's Department detective who stated appellant told him he was at home in bed at 4:00 a.m.

648

 With limited exceptions, the South Carolina Constitution requires a person be indicted by the grand jury before standing trial for a crime. S.C. Const. art. I, § 11. Accordingly, except for certain minor offenses, the circuit court does not have subject matter jurisdiction to convict a defendant of an offense unless (1) there has been an indictment which sufficiently states the offense (2) there has been a waiver of indictment; or (3) the charge is a lesser included charge of the crime charged in the indictment. *Carter v. State,* 329 S.C. 355, 495 S.E.2d 773 (1998).

South Carolina Code Ann. § 17–19–30 provides:

Every indictment for murder shall be deemed and adjudged sufficient and good in law which, in addition to setting forth the time and place, together with a plain statement, divested of all useless phraseology, of the manner in which the death of the deceased was caused, charges the defendant did feloniously, wilfully and of his malice aforethought kill and murder the deceased.

(Underline added).

 An indictment for murder is sufficient "if the offense is stated with sufficient certainty and particularity to enable the court to know what judgment to pronounce, the defendant to know what he is called upon to answer, and if an acquittal or a conviction thereon may be pleaded as a bar to any subsequent prosecution." *State v. Owens,* 293 S.C. 161, 165, 359 S.E.2d 275, 277 (1987); *see State v. Munn,* 292 S.C. 497, 357 S.E.2d 461 (1987) (test of sufficiency of indictment is whether or not it contains the necessary elements of the offense intended to be charged and sufficiently apprises the defendant of what he must be prepared to defend). Malice aforethought is an element of the offense of murder. S.C.Code Ann. § 16–3–10 (1985) (defining murder as 'the killing of any person with malice aforethought, either express or implied.'); *see Simmons v. State,* 264 S.C. 417, 215 S.E.2d 883 (1975).

 Here, the murder indictment states:

### COUNT ONE—MURDER

That [APPELLANT] did in Greenville County on or about November 1, 1997, while aiding, abetting and assisting

Steven Andra Golden in the commission of an Armed Robbery, kill one Irene Graves by means of shooting her, and that the said victim died as a proximate result thereof. This is in violation of South Carolina Code of Laws § 16–03–10.

▮ While the murder indictment does not specifically state appellant killed the victim with malice aforethought, it does state appellant killed the victim in violation of South Carolina Code Ann. § 16–3–10. This section defines murder as "the killing of any person with malice aforethought, either express or implied." Specific reference to § 16–3–10 in the body of the indictment provided appellant with notice of the elements of murder. *See State v. Crenshaw*, 274 S.C. 475, 266 S.E.2d 61 (1980) (where indictment referred to specific bribery code section on its face and there was lengthy discussion concerning that code section throughout the trial, defendants obviously knew for what crime they were being prosecuted); *State v. Beam*, 336 S.C. 45, 518 S.E.2d 297 (Ct.App.1999) (indictment was sufficient to apprise defendant of *mens rea* element in light of the fact the statutory citations were included). While the better practice is to set forth the elements of the crime in the indictment rather than referring to the statutory section alleged to have been violated, the indictment here was sufficient as it informed appellant of the elements of murder, including malice aforethought.[2]

We note appellant relies on *Carter v. State, supra*, to support his claim that reference to the statute is insufficient to notify the defendant of the elements of the offense. In *Carter*, the Court determined reference to the statute on the caption of the indictment was not controlling where it conflicted with the description of the offense in the body of the indictment. *Carter* did not hold reference to the statute in the body of the indictment is insufficient to authorize jurisdiction.

---

**2.** Appellant asserts *State v. Crenshaw, supra,* and *State v. Beam, supra,* are inapposite because the offenses in those cases were statutory while murder is a common law offense. While murder remains a common law offense, § 16–3–10 declares the common law. *Hinson v. State,* 297 S.C. 456, 377 S.E.2d 338 (1989). Accordingly, appellant was informed of the elements of common law murder, including malice aforethought, by reference to the statute.

### GUILT PHASE ISSUE

### II.

Appellant argues the trial judge erred by allowing the State to introduce evidence of his alleged involvement in the Prestige Cleaners and Conoco convenience store robberies on October 31 and November 1, 1997. He contends evidence of these two robberies was not admissible as part of the *res gestae.* We disagree.

Six weeks prior to trial, the trial judge heard appellant's motion *in limine* seeking to exclude evidence of two uncharged crimes: the armed robbery of Prestige Cleaners at 6:45 p.m. on October 31, 1997, and the armed robbery of a Conoco convenience store at 2:00 a.m. on November 1, 1997. The solicitor stated the Prestige Cleaners and Conoco robberies occurred less than ten hours before the Speedway robbery. The solicitor asserted:

[the crimes] are all part of the intertwined activities of these two individuals, along with the two other individuals through the course of this day. And we believe that the proof that is going to be required to establish this crime and what led to the crime is going to involve the action of these people that took place earlier in the day.

Where they were, where they had been together, how well they had to observe each other, I mean, and who was betting who [sic] that they could do what, and all the goings-on, I don't believe—the phrase has been used—they are inextricably intertwined with everything that went before them.

The solicitor further stated:

When I say the same individuals, there were other individuals other than these two defendants. But they were the same four individuals in all of them. They were in the same car, they're all using the same—going back to the same house, and they're all talking to each other throughout the entire day as to what they're going to do and planning their next move and going to the next place and that sort of thing.

The trial judge ruled evidence regarding the Prestige Cleaners and Conoco robberies was admissible.

During trial, without objection, Golden testified about appellant's role in the Prestige Cleaners and Conoco armed robberies. Golden explained around dinnertime on Halloween 1997, he, appellant, Vance, and Young were driving around, drinking alcohol, smoking marijuana, and deciding who they were going to rob. Initially, the four considered robbing a jewelry store but then decided to rob Prestige Cleaners. Golden and Young robbed the dry cleaners while appellant and Vance waited in the car. Golden explained they were "taking turns" committing the robberies. The four men then went to appellant's home where they split the money from the robbery and discussed robbing a Waffle House. The four went to the Waffle House but decided against robbing it because too many people were inside.

Thereafter, the men decided to rob a Conoco convenience store. Golden, Young, and appellant went into the Conoco; Vance remained outside in the car. After the robbery, the men returned again to appellant's home where they distributed the Conoco money. They discussed robbing the Speedway. Before going to the Speedway, Golden rented a motel room to create an alibi. The four men then decided Golden and appellant, the "original partners," would rob the Speedway while Young and Vance would rob a nearby Waffle House. Golden then described robbing the Speedway with appellant.

Without objection, Vance gave similar testimony about the Prestige Cleaners and Conoco robberies. Vance testified, during the Prestige Cleaners and Conoco robberies, he waited near the car, but he decided to rob the Waffle House because the others were "getting away with [the robberies]. It looked easy" and he wanted to "be part of it."

Generally, a motion *in limine* seeks a pretrial evidentiary ruling to prevent the disclosure of potentially prejudicial matter to the jury. *State v. Smith*, 337 S.C. 27, 522 S.E.2d 598 (1999). A pretrial ruling on the admissibility of evidence is preliminary and is subject to change based on developments at trial. *Id.* A ruling *in limine* is not final; unless an objection is made at the time the evidence is offered and a final ruling procured, the issue is not preserved for review. *Id.*

■ Appellant failed to object to the solicitor's questions concerning his involvement in the Prestige Cleaners and Conoco armed robberies. Accordingly, this issue is not preserved for consideration on appeal. *Id.*

■ In any event, the *res gestae* theory recognizes evidence of other bad acts may be an integral part of the crime with which the defendant is charged or may be needed to aid the fact finder in understanding the context in which the crime occurred. *State v. King*, 334 S.C. 504, 514 S.E.2d 578 (1999); *State v. Adams*, 322 S.C. 114, 470 S.E.2d 366 (1996). This evidence of other crimes is admissible:

> when such evidence "furnishes part of the context of the crime" or is necessary to a "full presentation" of the case, or is so intimately connected with and explanatory of the crime charged against the defendant and is so much a part of the setting of the case and its "environment" that its proof is appropriate in order "to complete the story of the crime on trial by proving its immediate context or the 'res gestae'" or the "uncharged offense is 'so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other ... '[and is thus] part of the res gestae of the crime charged.' And where evidence is admissible to provide this 'full presentation' of the offense," [t]here is no reason to fragmentize the event under inquiry" by suppressing parts of the "res gestae."

*State v. Adams*, 322 S.C. at 122, 470 S.E.2d at 370–71 (quoting *United States v. Masters*, 622 F.2d 83, 86 (4th Cir.1980) (citations omitted)). Under this theory, it is important that the temporal proximity of the prior bad act be closely related to the charged crime. *State v. Hough*, 325 S.C. 88, 480 S.E.2d 77 (1997). Even if the evidence is relevant under this theory, prior to admission the trial judge should determine whether its probative value clearly outweighs any unfair prejudice. Rule 403, SCRE; *State v. Bolden*, 303 S.C. 41, 398 S.E.2d 494 (1990).

■ Evidence regarding the Prestige Cleaners and Conoco robberies was properly admitted under the *res gestae* theory. Evidence of the two prior robberies, committed by various combinations of the same four individuals within hours

of the Speedway robbery, was necessary to place the Speedway crime in context. Evidence of the two prior robberies was critical for the jury to understand the nature and environment of the Speedway robbery—that the four men committed the Speedway robbery as part of a robbery spree. *Contra State v. Beck*, 342 S.C. 129, 536 S.E.2d 679 (2000) (finding prior crime was not part of "criminal episode" for which defendant was on trial).

Moreover, the probative value of the evidence outweighed its prejudicial effect. Appellant's participation in the prior robberies with the same individuals shortly before the Speedway robbery was evidence he participated in the Speedway robbery with the same individuals. Further, Golden and Vance's testimony suggests that the success of the earlier robberies encouraged appellant to rob the Speedway.

## *SENTENCING PHASE ISSUES*

The jury returned guilty verdicts on Monday, February 15, 1999, at approximately 8:30 p.m. The trial judge ordered the sentencing phase of trial to begin on Wednesday at 9:00 a.m.

When court reconvened on Wednesday, February 17, defense counsel notified the trial judge they had been served with a "Supplemental Notice of Aggravation" around 1:00 the previous afternoon. The notice indicated the State's intent to introduce evidence of appellant's "future dangerousness and his inability to adapt to prison as demonstrated in the incident involving the death of Christopher Lee on or about February 16, 1999 at the Greenville County Detention Center." The notice further stated, "[t]he State has previously noticed [appellant] of its intent to introduce evidence of [his] character before, during and after the crime." [3]

Defense counsel explained inmate Christopher Lee died at the Greenville County Detention Center early on the morning of February 16 and appellant gave a statement confessing to killing him. Appellant was arrested on murder charges the same day. Defense counsel argued appellant's confession

---

**3.** In early January, the State provided appellant with its "Notice of Aggravation." In addition to other matters, the document indicates the State intended to introduce "characteristics of the defendant before, during and after the crime."

should not be admitted because (1) counsel did not have sufficient opportunity to rebut the statement and (2) the statement was given without first notifying defense counsel. The solicitor stated he faxed the statement to defense counsel as soon as he received it.

The trial judge took defense counsel's objections under advisement and proceeded with the sentencing phase. The State presented evidence in aggravation and victim impact testimony.

Thereafter, the trial judge excused the jury and the solicitor stated he intended to offer appellant's February 16th statement. Defense counsel again objected, claiming the statement was involuntary because it was made without notifying defense counsel and in violation of appellant's right against self-incrimination.

The trial judge conducted a hearing to determine the voluntariness of appellant's statement. South Carolina Law Enforcement Division (SLED) Agent Dean Brown testified he arrived at the Greenville County Detention Center the previous morning at 8:45 a.m. He was present when appellant was advised by SLED Agent Elizabeth Corley that (1) he had the right to remain silent, (2) anything he said could be used against him in court, (3) he had the right to talk to a lawyer for advice before questioning and have a lawyer present during questioning, and (4) an attorney would be appointed for him if he could not afford counsel. Brown testified appellant appeared to understand his rights and signed a form indicating he had been advised of those rights. Brown testified that at no time did appellant state he was represented by counsel and wanted counsel present.

Brown stated he knew appellant was in the twenty-four hour waiting period of a murder trial. He testified he told appellant the purpose of the investigation was to determine what happened the night before.

On cross-examination, Brown stated appellant asked who he and Corley worked for and he inquired if they knew Detective Bellew.[4] Brown testified Agent Corley told appellant that "this did not have anything to do with what [appellant] was

---

4. Bellew is a detective with the Greenville County Sheriff's Office.

going through at the time." Brown testified Corley did not mean appellant's statement would not be used against him in his current trial. Brown stated he did not know appellant's statement would be used against him during the current trial. According to Brown, appellant was willing to talk and freely provided information; he was not coerced or threatened.[5]

Appellant did not offer any witnesses during the *Jackson v. Denno* [6] hearing.

The trial judge ruled neither appellant's Fifth nor Sixth Amendment rights were violated and concluded appellant's statement was voluntary.

Thereafter, defense counsel moved for a continuance to allow time to investigate whether there were any extenuating circumstances surrounding Lee's death. The trial judge denied the motion.

In the presence of the jury, Agent Brown testified about the investigation into Lee's death and the taking of appellant's February 16th statement.

The solicitor published appellant's statement as follows:

At eleven p.m. on 2–15–99, myself and the other inmates in my cell block watched the news and saw that I was found guilty. I then worked out and took a shower. I went to bed and woke up whenever they came to get one of the other inmates to take him to Perry. This was around 3:00 a.m.

While they were getting the guy ready to go to Perry, Christopher Lee said, 'You won't be the only one because [appellant's] coming down there with you.' I told him to 'shut the f--- up.' He told me his cousin was on the jury.[7] I asked him if he knew that they convicted me. He said quote 'f--- you. I know because my cousin was on the jury,' unquote.

I then walked into his cell and hit him in the eye. He fell down on his back. I got on top and started hitting him

5. Appellant's statement began at 9:25 a.m. and concluded at 11:05 a.m.

6. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

7. The trial judge determined no member of the jury was either related to or acquainted with Lee.

mostly in the face and throat. I took a pen from his right hand with my right hand and stabbed him in his right eye. I then tried to stab him in his chest, but the pen would not go in. Then I stabbed him in his throat. I don't know if the pen went into his throat or not. He started bleeding out of his mouth.

There was a sheet tied into a snare laying on his bed. I reached and got it and put it over his head onto his neck. I wrapped it around my left hand and pulled it tight. I started hitting him in the face with my right hand. Then I started choking him with my right hand and pounding his head against the floor.

He never fought back after the first punch, he was out of it. He was still breathing and the stuff coming out of his mouth stunk so I stood up and stomped his head and body with my feet. I saw a black and blue lighter under the bunk. I grabbed it and burned him around the eye and on the left side of his hair. I rammed his head into the wall. He was still moaning and breathing. I walked out of the cell to leave him alone. I heard the crazy moaning again so I grabbed the pen off the floor where I had thrown it and went back into his cell. I got back over him and rammed the pen up his right nostril. I closed his left nostril with my left hand and started choking him with my right hand. The sheet was still around his neck. I was choking him above the sheet. Throughout all of the above he was moaning and breathing.

I kept checking him to see if he was dead. I would check his pulse on his wrist and I put my ear beside his neck and chest to hear if he was breathing. I wanted him to be dead at that time. I finally thought he was dead so I threw him on his bunk and covered him up. The first time I put him on the bunk he fell off. I then packed my stuff and put my mattress on the table and went to sleep.

While I packed my stuff the black guy that had been on the top bunk of Christopher's cell the whole time this went on got down and put his mattress on the other table and sit [sic] down. Everyone in the cell block was awake when I left Christopher.

I woke up when Hefner opened the door to bring in breakfast and I got into line. I was third in line. Sergeant

McNeil walked by and I told him to cuff me. He said he would not and I told him he would if he would go into Christopher's cell. He looked into the cell and Hefner went into the cell. Sergeant McNeil told Hefner to cuff me, which he did. Sergeant McNeil then called someone on the radio.

I really did it because I was wrongly convicted of murder.

Immediately after publication, the trial judge instructed the jury it could only consider the statement as evidence of appellant's character, not as evidence of a statutory aggravating circumstance. In his charge, the trial judge also instructed the jury it could only consider robbery while armed with a deadly weapon and larceny with use of a deadly weapon as aggravating circumstances.

On cross-examination, Agent Brown stated thirteen people, including appellant, were housed in the cell where Lee was killed. He further stated, according to appellant's statement, Lee arguably taunted appellant and the investigation into Lee's death was not yet completed.

The same day, February 17 th, the jury returned a verdict finding the aggravating circumstance of murder while in the commission of armed robbery and recommending appellant be sentenced to death.

On Friday, February 19, 1999, *The Greenville News* reported a second suspect was charged in Lee's death on Thursday, February 18, 1999. According to the article, another inmate, Fred Walker, Jr., assisted appellant in killing Lee.

Defense counsel filed a Motion for a New Trial based on the after-discovered evidence of Walker's arrest and inconsistencies in the coroner's report and appellant's confession. At the motion hearing, defense counsel argued, had they been able to tell the jury a second individual had also been arrested for Lee's murder, the impact of appellant's confession would have been diluted. The trial judge denied appellant's motion for a new sentencing proceeding.

### III.

Appellant argues the trial judge erred by admitting his February 16 th statement because it was not within the ambit

of the State's Notice of Aggravation. He further asserts his statement was inadmissible because the State's Supplemental Notice of Aggravation was not served pre-trial as required by South Carolina Code Ann. § 16–3–20(B) (Supp.2000). We disagree.

Section 16–3–20(B) provides:

> In the sentencing proceeding, the jury ... shall hear additional evidence in extenuation, mitigation, or aggravation of the punishment. <u>Only such evidence in aggravation as the State has informed the defendant in writing before the trial is admissible.</u>

(Underline added).

The purpose of § 16–3–20(B) is to ensure a capital defendant is given a fair and complete opportunity to respond to each factual allegation used by the State as a justification for a sentence of death. *State v. Riddle*, 291 S.C. 232, 353 S.E.2d 138 (1987). The statutory notice requirement is not limited to evidence of statutory aggravating factors; instead "[u]nder limited circumstances, the notice requirement of section 16–3–20(B) applies to evidence not specifically enumerated in the statute and introduced by the prosecution during the sentencing phase." *State v. Humphries*, 325 S.C. 28, 479 S.E.2d 52 (1996).

More than one month before trial, the State notified defense counsel in writing it intended to introduce "characteristics of the defendant before, during and after the crime" as evidence in aggravation. The trial judge admitted appellant's February 16th statement as evidence of his character. Accordingly, appellant was timely informed the State planned to introduce evidence of his character, including character evidence arising after the Speedway murder, during the sentencing proceeding.[8] The State's notice complied with § 16–3–20(B).

---

8. For purposes of this discussion, we have assumed § 16–3–20(B) requires the State to notify a defendant it intends to introduce character evidence as evidence in aggravation during the penalty phase of a capital trial.

## IV.

Appellant contends his February 16th statement was obtained in violation of his Fifth and Fourteenth Amendment protections and in violation of due process, and, therefore, was inadmissible. We disagree.

First, appellant contends the interrogation on the Lee matter violated his Fifth Amendment right to counsel which he asserts he invoked in the Speedway matter. We disagree.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." In order "to counteract the 'inherently compelling pressures' of custodial interrogation," the suspect may request the presence of counsel. *McNeil v. Wisconsin*, 501 U.S. 171, 176, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). "Statements elicited during custodial interrogation [are] admissible if the prosecution ... establish[es] that the suspect 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.* citing *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

"Once a suspect asserts the right [to counsel], not only must the current interrogation cease, but he may not be approached for further interrogation 'until counsel has been made available to him.'" *McNeil v. Wisconsin, supra* at 177–178, 111 S.Ct. 2204 *citing Edwards v. Arizona*, 451 U.S. 477, 484–485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). If the police reinitiate questioning in the absence of counsel, the suspect's statements are presumed involuntary and, therefore, inadmissible. *Id.*

Here, there is no evidence appellant declined to speak with police without the presence of counsel in the Speedway matter. In fact, the evidence offered at the guilt phase of trial indicates appellant voluntarily waived his right to counsel and spoke to the Sheriff's Department about the Speedway matter. This issue is patently without merit.

Second, appellant claims his statement was the result of police deception, rather than voluntary, because Agent Corley told him the questioning had nothing to do with the

Speedway case, thereby implying any statement he gave would not be used in the penalty phase of the Speedway trial. We disagree.

 The test for determining the admissibility of a statement is whether it was knowingly, intelligently, and voluntarily given under the totality of the circumstances. *State v. Peake*, 291 S.C. 138, 352 S.E.2d 487 (1987). A statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise. *Id.*

 On appeal, this Court does not re-evaluate the facts based on its own view of the preponderance of the evidence but simply determines whether the trial judge's ruling is supported by any evidence. *State v. Wilson*, 345 S.C. 1, 545 S.E.2d 827 (2001). The conclusion of the trial judge on issues of fact as to the voluntariness of a confession will not be disturbed unless so manifestly erroneous as to show an abuse of discretion. *State v. Livingston*, 223 S.C. 1, 73 S.E.2d 850 (1952).

Considering the totality of the circumstances surrounding the statement, the evidence supports the trial judge's ruling that appellant's statement in the Lee matter was not induced by a promise the statement would not be used in the Speedway trial. According to the record, Agent Corley told appellant the interrogation had nothing to do with his pending murder trial. The agent's assertion did not imply appellant's statements would not be used during the Speedway trial, but rather, the current investigation was unrelated to the case for which he was on trial. Appellant could not reasonably have thought otherwise, especially since the SLED agent had informed him that anything he said could be used against him in court. *Cf. State v. Rochester*, 301 S.C. 196, 391 S.E.2d 244 (1990) (polygraph examiner's statement that it would be in defendant's best interest to tell the truth was not on its face an inducement or hope of lighter punishment and resulting statement was properly determined voluntary) *with State v. Peake, supra* (where defendant made inculpatory statement after unequivocally being told by interrogating officers that the State would not seek the death penalty if he gave a statement, State failed to meet its burden of showing the

defendant's statement was voluntary). The trial judge did not abuse his discretion in determining appellant's statement was voluntary. Similarly, because there was no misrepresentation, appellant's due process rights were not violated.

## V.

Appellant contends his February 16th statement was obtained in violation of his Sixth and Fourteenth Amendment right to counsel and, therefore, inadmissible. Specifically, appellant claims the trial judge erred by failing to exclude his statement concerning Lee's death because it was taken in violation of his asserted right to counsel for the Speedway offenses. Appellant contends *Texas v. Cobb*, 532 U.S. 162, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001), supports his claim that the Sixth Amendment right to counsel is "prosecution specific" in that once invoked, no evidence obtained in contravention of that invocation is admissible. We disagree.

The Sixth Amendment right to counsel attaches when adversarial judicial proceedings have been initiated and at all critical stages. *McNeil v. Wisconsin, supra.* The right attaches only "post-indictment," at least in the questioning/statement area. *State v. George*, 323 S.C. 496, 476 S.E.2d 903 (1996).

South Carolina follows the federal constitutional rule that the Sixth Amendment right to counsel is offense-specific; the mere fact counsel is appointed in one matter does not invoke the right to counsel in an unrelated matter. *Id., citing McNeil v. Wisconsin, supra* U.S. at 176, 111 S.Ct. 2204 ("The Sixth Amendment right to counsel . . . cannot be invoked once for all future prosecutions. . . .").

In *Texas v. Cobb, supra,* the United States Supreme Court determined Sixth Amendment protections do not necessarily extend to offenses that are "factually related" to those offenses to which the right to counsel has already attached.[9] However, once the Sixth Amendment right to

---

9. The Supreme Court rejected the claim that its ruling would prove disastrous to suspects' constitutional rights. It noted a suspect who has counsel for charged offenses is not left without constitutional protection—a suspect must be apprised of his right against compulsory self-

counsel has attached, it does encompass those offenses which, even if not formally charged, would be considered the same offense for double jeopardy purposes. In this sense, the Sixth Amendment is "prosecution specific;" it prohibits interrogation on charged offenses as well as uncharged offenses which, because of double jeopardy, could not be the subject of a later prosecution.

Appellant's Sixth Amendment right to counsel in the Speedway matter was not compromised by his interrogation concerning the Lee matter. Because the Sixth Amendment right to counsel is offense-specific, the attachment of appellant's right to counsel in the Speedway matter, did not invoke the right to counsel in the Lee matter. *McNeil v. Wisconsin, supra; State v. George, supra.*[10]

Moreover, contrary to appellant's argument, *Texas v. Cobb, supra,* does not prohibit the admission of evidence—obtained as the result of an uncounseled interrogation for an unrelated offense where the right to counsel has yet to attach—in a trial where the Sixth Amendment right has attached. Instead, once the Sixth Amendment attaches it prohibits uncounseled interrogation and the admission of any evidence obtained as a result of the interrogation, both for the crime for which it has attached and for a crime which would be considered the same offense if charged.

Here, the Speedway and Lee crimes were completely unrelated and could not possibly be considered the same offense.[11]

---

incrimination and to consult with an attorney before authorities can conduct custodial interrogation. Further, the Court determined "the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses." *Texas v. Cobb, supra,* 121 S.Ct. at 1343.

10. At the time he was questioned by the SLED agents on the Lee matter, the Sixth Amendment had not attached for the Lee offense as adversarial judicial proceedings had not begun against appellant for Lee's murder. *See Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (Sixth Amendment does not attach simply because investigation focuses on defendant).

11. *See Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ("[w]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to

Accordingly, investigators properly questioned appellant about Lee's death without violating his right to counsel in the Speedway matter. Appellant's statement obtained as a result of the questioning was properly admitted in appellant's trial for the Speedway crimes without violating appellant's Sixth Amendment right to counsel. We conclude the trial judge did not err by refusing to exclude appellant's February 16th statement on Sixth Amendment grounds.

## VI.

### A.

Appellant argues his due process rights [12] were violated by the admission of his February 16th statement because he did not have sufficient opportunity to investigate the reliability and accuracy of the document. He asserts the trial judge should have either (1) excluded the statement due to lack of notice or (2) continued the sentencing proceeding to allow defense counsel the opportunity to explain or rebut information regarding Lee's death.

### 1.

The record indicates the solicitor provided defense counsel with a copy of appellant's statement two hours after the statement was taken.[13] This notification was timely.

### 2.

Due process prohibits a defendant from being sentenced to death "on the basis of information which he had

---

determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.").

12. U.S. Const. amend XIV; S.C. Const. art. I, § 3.

13. The State asserts appellant was not entitled to notice it intended to admit his statement. *See Gray v. Netherland*, 518 U.S. 152, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (in denying petition for habeas corpus, Supreme Court recognized prior case law did not hold due process requires advance notice of the specific evidence of unadjudicated conduct the prosecution intends to introduce during penalty phase of capital trial). In light of our disposition on this matter, we need not determine whether appellant was entitled to notice under due process precepts.

no opportunity to deny or explain." *Gardner v. Florida,* 430 U.S. 349, 362, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. Due process does not mandate any particular form of procedure. Instead, due process is a flexible concept, and the requirements of due process in a particular case are dependent upon the importance of the interest involved and the circumstances under which the deprivation may occur.

*South Carolina Dep't of Social Services v. Holden,* 319 S.C. 72, 78, 459 S.E.2d 846, 849 (1995) *citing S.C.N.B. v. Central Carolina Livestock Market,* 289 S.C. 309, 345 S.E.2d 485 (1986) (internal citations omitted). Granting a continuance is one measure the court may use to protect an accused's due process rights. *State–Record Co., Inc., v. State of South Carolina,* 332 S.C. 346, 504 S.E.2d 592 (1998).

The grant or denial of a motion for a continuance is within the sound discretion of the trial judge whose ruling will not be disturbed on appeal absent an abuse of discretion resulting in prejudice to the appellant. *State v. Babb,* 299 S.C. 451, 385 S.E.2d 827 (1989).

When a motion for a continuance is based upon the contention that counsel for the defendant has not had time to prepare his case its denial by the trial court has rarely been disturbed on appeal. It is axiomatic that determination of such motions must depend upon the particular facts and circumstances of each case.

*State v. Motley,* 251 S.C. 568, 572, 164 S.E.2d 569, 570 (1968).

Although aware of appellant's February 16th statement, defense counsel had little, if any, meaningful opportunity to investigate the circumstances surrounding Lee's death. Because of the capital nature of the proceeding and given the timing of appellant's statement, we find due process necessitated a brief, perhaps twenty-four hour, continuance to allow defense counsel the opportunity to interview the inmates and personnel at the detention center. Further, without a fair opportunity to counter the statement, appellant's graphic rendition of the brutal details of Lee's death was highly prejudicial. Although reversals of the refusal to grant a continuance

are as "rare as the proverbial hens' teeth," [14] under the most unusual circumstances presented here, this is one of those rare cases. Accordingly, we remand for a new sentencing proceeding.

### B.

Appellant argues the admission of his February 16th statement violated the Eighth Amendment because it permitted the jury to consider inaccurate information (a second person was also charged with Lee's murder), thereby rendering his death sentence unreliable. In light of our ruling above, we need not address this issue.

### C.

Appellant argues the probative value of his February 16th statement was outweighed by its prejudicial effect and, therefore, the statement was inadmissible. We disagree.

The purpose of the sentencing phase in a capital trial is to direct the jury's attention to the specific circumstances of the crime and the characteristics of the offender. *State v. Locklair,* 341 S.C. 352, 535 S.E.2d 420 (2000); *see Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (in capital cases, the Eighth Amendment requires consideration of the character and record of the individual offender as a constitutionally indispensable part of the process of inflicting the penalty of death). In the penalty phase, the admission of evidence the defendant committed a similar crime is proper as it indicates his individual characteristics. *State v. George, supra* (trial court properly admitted defendant's statement regarding unrelated robbery and killing as character evidence in penalty phase); *State v. Howard,* 295 S.C. 462, 369 S.E.2d 132 (1988) (confessions to seventy armed robberies and another murder were properly admitted in penalty phase as evidence of other crimes relevant to the defendant's character).

Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair

---

14. *See State v. Brooks,* 235 S.C. 344, 111 S.E.2d 686 (1959).

prejudice. Rule 403, SCRE. Unfair prejudice means an undue tendency to suggest a decision on an improper basis. *State v. Dickerson,* 341 S.C. 391, 535 S.E.2d 119 (2000).

Appellant's statement was relevant evidence of his character, an issue under consideration during the penalty phase of trial. While clearly prejudicial, appellant's statement does not suggest a decision on an improper basis. Admission of appellant's statement did not violate Rule 403, SCRE.

## VII.

Appellant argues the trial judge abused his discretion by denying his motion for a new sentencing hearing based on the after-discovered evidence that Fred Walker, Jr., was also charged with Lee's death. Because this matter is remanded for a new sentencing proceeding, it is unnecessary to rule on this issue.

## VIII.

Appellant contends the trial judge erred in sentencing him for possession of a firearm in the commission of a violent offense because South Carolina Code Ann. § 16–23–490(A) prohibits such a sentence where the death penalty is imposed. We agree.

Section 16–23–490(A) (Supp.2000) states:

If a person is in possession of a firearm or visibly displays what appears to be a firearm ... during the commission of a violent crime and is convicted of committing ... a violent crime ..., he must be imprisoned five years, in addition to the punishment for the principal crime. *This five-year sentence does not apply in cases where the death penalty or a life sentence without parole is imposed for the violent crime.*

(Underline added).

Section 16–23–490(A) expressly provides the mandatory five year sentence for possession of a firearm during the commission of a violent crime shall not be imposed when the defendant is sentenced to death or to life without parole for the violent crime. Appellant was sentenced to death. Accordingly, we vacate the five year sentence for possession of a firearm

during the commission of a violent crime. If, on resentencing, appellant receives a sentence other than death or life without the possibility of parole, he shall also be sentenced to five years imprisonment for possession of a firearm during the commission of a violent crime. *See* S.C.Code Ann. § 16–3–20 (Supp.2000) (establishing circumstances under which mandatory minimum term of imprisonment of thirty years is available sentence).

## CONCLUSION

Appellant's convictions are affirmed. Appellant's sentence for possession of a firearm during the commission of a violent crime is vacated. This matter is remanded to the circuit court for a new sentencing proceeding.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

TOAL, C.J., MOORE and WALLER, JJ., concur.
PLEICONES, J., concurring in a separate opinion.

PLEICONES, Justice:

I concur in the majority's decision, but write separately because I would omit the substantive analysis of the constitutional issues in Parts IV and V relating to the February 16th statement. We are agreed that appellant's due process rights were violated when the trial judge denied his request for a continuance to investigate the circumstances surrounding the making of the statement. I would therefore refrain from addressing the constitutional issues on the incomplete record now before us. *Compare In the Matter of McCracken,* 346 S.C. 87, 551 S.E.2d 235 (2001)( Court's firm policy not to address constitutional issues unless necessary to decide appeal).