# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Tyrone Aiken, Matthew Clark, Eric Graham, Bradford M. Haigler, Angelo Ham, J'Corey S. Hull-Kilgore, Damian Inman, Rogert Legette, Terriel Mack, Jennifer L. McSharry, Wallace Priester, Davon Reed, Dondre M. Scott, Edgar L. Thomas, James Van, et al., Petitioners,

v.

William R. Byars, Jr., Director, South Carolina Department of Corrections, and Alan Wilson, Attorney General of South Carolina, Respondents.

Appellate Case No. 2012-213286

---

## ORIGINAL JURISDICTION

---

Opinion No. 27465
Heard January 8, 2014 – Filed November 12, 2014

---

## RELIEF GRANTED

---

John H. Blume, Sheri L. Johnson, Keir M. Weyble, of Cornell Law School, of Ithica, NY; Elizabeth Franklin-Best, of Blume, Norris, & Franklin-Best, LLC, of Columbia; Joshua A. Bailey, of Finklea Law Firm, of Florence; Charles Grose, Jr., of Grose Law Firm, of Greenwood; Diana L. Holt, of Diana Holt, LLC, of Columbia; and Chief Appellate Defender Robert M. Dudek, of Columbia, all for Petitioners.

Attorney General Alan M. Wilson, Senior Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General J. Benjamin Aplin, all of Columbia, for Respondents.

Christopher D. Scalzo, of Greenville, for Amicus Curiae, S.C. Public Defender Association.

Joseph M. McCulloch, Jr., of Law Offices of Joseph M. McCulloch, Jr., of Columbia, and Abby F. Rudzin and Abby C. Johnston, both of O'Melveny & Myers, LLP, of New York, NY, for Amicus Curiae, The South Carolina State Conference of the NAACP.

John S. Nichols, of Bluestein Nichols Thompson & Delgado, LLC, of Columbia, for Amicus Curiae, South Carolina Psychological Association.

**JUSTICE HEARN:** In this case brought in our original jurisdiction, fifteen inmates who were sentenced to life without parole as juveniles petition this Court for resentencing in light of the United States Supreme Court's decision in *Miller v. Alabama*, 132 S. Ct. 2455 (2012).[1]  We hold their sentences violate the Eighth Amendment under *Miller* and the petitioners and those similarly situated are entitled to resentencing.

## FACTUAL/PROCEDURAL BACKGROUND

The petitioners were all convicted for homicides committed while they were juveniles.  Some pled guilty and others were convicted after a jury trial.  Some were found directly responsible for the relevant homicide while others were convicted under a theory of accomplice liability.  All were sentenced to life without parole according to existing sentencing procedures, which made no distinction between defendants whose crimes were committed as an adult and those whose crimes were committed as a juvenile.  In most of the sentencing hearings—

---

[1] In South Carolina, pursuant to Section 63-19-20 of the South Carolina Code (2010), a juvenile is a person less than seventeen years of age.  However, *Miller* extends to defendants under eighteen years of age and therefore for the purposes of this opinion we consider juveniles to be individuals under eighteen.

but not all—defense counsel mentioned the age of the defendant at the time of the crime, and in some cases, there was a brief discussion of the defendant's life prior to commission of the crime. Of the fifteen petitioners, thirteen of their cases have become final.[2]

The petitioners filed a petition for a writ of certiorari in our original jurisdiction, naming the Director of the South Carolina Department of Corrections, William R. Byars, Jr., and Attorney General Alan Wilson as the respondents. We granted certiorari to address the effect of *Miller* on the petitioners and others similarly situated who were sentenced to life without parole as juveniles.

## ISSUES PRESENTED

I.      Does *Miller* apply retroactively?

II.     Does *Miller* apply to juveniles who received a nonmandatory sentence of life without parole?

## LAW/ANALYSIS

The Eighth Amendment to the United States Constitution provides, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.[3] Although the earliest Eighth Amendment cases focused on the barbarous nature of a punishment, the jurisprudence evolved to encompass challenges to the proportionality of the sentence to the offense. *Gregg v. Georgia*, 428 U.S. 153, 170–72 (1976). When considering whether a sentence is proportional, the Supreme Court has acknowledged that the scope of the Eighth Amendment is not static, but "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).

---

[2] Our holding is moot with respect to Damian Inman, whose convictions and sentences were reversed on other grounds in *State v. Inman*, 409 S.C. 19, 760 S.E.2d 105 (2014), and Dondre Scott, whose convictions and sentences were reversed on other grounds in *State v. Scott*, 406 S.C. 108, 749 S.E.2d 160 (Ct. App. 2013).

[3] The Eighth Amendment applies against the states by virtue of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 666–67 (1962).

In *Miller*, the United States Supreme Court confronted a challenge to the mandatory imposition of life without parole sentences on juveniles as violative of the Eighth Amendment's prohibition of cruel and unusual punishments. 132 S. Ct. at 2461. In considering this question, the Supreme Court analyzed two strands of precedent impacting the proportionality compelled by the Eighth Amendment. The first line of cases dealt with categorical bans on certain sentences based on the inability to reconcile the class of offenders and the severity of the penalty. In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court invalidated the death penalty for all juvenile offenders. Thereafter, in *Graham v. Florida*, 560 U.S. 48 (2010), the Court held that life without parole violates the Eighth Amendment when imposed on juvenile nonhomicide offenders. The *Miller* Court noted that *Graham* equated life without parole sentences for juveniles to the death penalty, invoking a second line of cases that require sentencing authorities to consider the individual characteristics of a defendant and the details of his offense prior to imposing a sentence of death. 132 S. Ct. at 2463–64; *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion) (holding that "in all but the rarest kind of capital case" the sentencer must "not be precluded from considering *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death"); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (requiring "consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death"). The Court therefore held that "the confluence of these two lines of precedent leads to the conclusion that mandatory life-without-parole sentences for juveniles violates the Eighth Amendment." 132 S. Ct. at 2464. A sentencer must be allowed to consider that "youth is more than a chronological fact," and carries with it "immaturity, irresponsibility, impetuousness[,] and recklessness," factors as transient as youth itself. *Id.* at 2467 (alteration in original). Although a court may still sentence a juvenile to life without parole after an individualized hearing, the Court cautioned that given "children's diminished culpability and heightened capacity for change" the "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* at 2469.

## I.    RETROACTIVITY

Before considering whether *Miller* applies to juveniles who received a sentence of life without parole under a nonmandatory scheme, we first must resolve the threshold issue of whether *Miller* applies retroactively.

Under our current jurisprudence, the United States Supreme Court's decision in *Teague v. Lane*, 489 U.S. 288 (1989), governs whether a new rule of criminal procedure is retroactive.[4] *Talley v. State*, 371 S.C. 535, 640 S.E.2d 878 (2007). In *Teague*, the Supreme Court held that a new constitutional rule of criminal procedure should not apply to cases that became final before the new rule is announced. 489 U.S. at 310. However, this general prohibition against the retroactive application of new constitutional rules is subject to two exceptions.[5] First, a new rule may be applied retroactively if the rule is substantive. *Id*. at 311. Second, a new rule may be applied retroactively if it is a "watershed rule" of criminal procedure. *Id*. We need not consider whether *Miller*'s holding constitutes a watershed rule because we find it is substantive and thus meets *Teague*'s first exception.

A rule is substantive if it prohibits the States from criminalizing certain conduct or prohibits "a certain category of punishment for a class of defendants because of their status or offense." *Saffle v. Parks*, 494 U.S. 484, 494 (1990) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 330 (1989), *abrogated by Atkins v. Virginia*, 536 U.S. 304, 321 (2002)). New substantive rules apply retroactively on collateral review because they "necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him." *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004) (internal quotation marks omitted). By contrast, a rule that merely regulates the manner in which a defendant is adjudicated guilty is procedural. *Id*.

We conclude *Miller* creates a new, substantive rule and should therefore apply retroactively.[6] The rule plainly excludes a certain class of defendants—

---

[4] This Court has not addressed whether it should employ a more expansive analysis for determining retroactivity after *Danforth v. Minnesota*, 552 U.S. 264 (2008), which held that state courts can use a broader test than *Teague*. *Id*. at 282 (holding that *Teague* "does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed 'nonretroactive' under *Teague*"). We find it unnecessary to do so today because *Miller* is clearly retroactive under *Teague*.

[5] The parties do not dispute that *Miller* announced a new rule, only whether an exception applies.

[6] Our holding is in accord with several other jurisdictions that have addressed this question. *See, e.g.*, *People v. Williams*, 982 N.E.2d 181, 196–97 (Ill. App. Ct.

juveniles—from specific punishment—life without parole absent individualized considerations of youth.[7] Failing to apply the *Miller* rule retroactively risks subjecting defendants to a legally invalid punishment. Moreover, while not in itself determinative, we find support for our conclusion in the Court's decision to apply the rule announced in *Miller* to the companion case *Jackson v. Hobbs*, 378 S.W.3d 103 (2011). Although *Miller* was on direct appeal, *Jackson* involved a petition for habeas corpus after the affirmance of the defendant's convictions. That case was therefore final and was before the Court on collateral review. As noted by the Iowa Supreme Court, "There would have been no reason for the Court to direct such an outcome if it did not view the *Mille*r rule as applying retroactively to cases on collateral review." *Ragland*, 836 N.W. 2d at 116.

## II.    SCOPE OF *MILLER*'S HOLDING

### A.    Applicability of *Miller* to the petitioners

Having concluded the rule in *Miller* applies retroactively, we now turn to whether it extends to the petitioners, who were sentenced to life without parole under a nonmandatory statutory scheme.

In analyzing the precedent relevant to the constitutional question before it, the Court in *Miller* noted that *Roper* and *Graham* established that children were constitutionally different from adults for sentencing purposes, a conclusion that

---

2012); *State v. Ragland*, 836 N.W. 2d 107, 116 (Iowa 2013); *Diatchenko v. Dist. Attorney for Suffolk Dist.*, 1 N.E.3d 270, 281 (Mass. 2013); *Jones v. State*, 122 So.3d 698, 702 (Miss. 2013); *see also* Erwin Chemerinsky, *Chemerinsky: Juvenile Life-Without-Parole Case Means Courts Must Look at Mandatory Sentences*, A.B.A J. Law News Now (Aug. 8, 2012, 8:30 AM), http://www.abajournal.com/news/article/chemerinsky_juvenile_life-without-parole_case_means_courts_must_look_at_sen/ ("[*Miller*] says that it is beyond the authority of the criminal law to impose a mandatory sentence of life without parole. It would be terribly unfair to have individuals imprisoned for life without any chance of parole based on the accident of the timing of the trial.").

[7] We fear that the dissent is conflating the retroactivity analysis and the applicability analysis. A particular jurisdiction's statutory framework has no bearing on the threshold determination of whether *Miller* applies retroactively. A new rule announced by the Supreme Court is not amorphous; it is either a substantive rule of law that applies retroactively, or it is not.

was based on common sense as well as science and social science. 132 S. Ct at 2464. "*Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id.* at 2465. Specifically, the Court noted juveniles differ from adults in their general "lack of maturity and [] underdeveloped sense of responsibility," "vulnerab[ility] . . . to negative influences and outside pressures, including family and peers," and still evolving character and personality traits. *Id.* at 2464 (ellipsis in original) (quoting *Roper*, 543 U.S. at 569–70). Important to our determination of the breadth of the *Miller* decision is this statement by the majority: "*Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses." *Id*. at 2465.

Thus, the *Miller* Court unequivocally held that youth has a constitutional dimension when determining the appropriateness of a lifetime of incarceration with no possibility of parole, and that the mandatory penalty schemes at issue prevented the sentencing authority from considering the differences between adult and juvenile offenders before imposing a sentence of life without parole. Focusing on *Graham*'s treatment of juvenile life sentences as analogous to capital punishment, the majority held that *Woodson* and its progeny required an individualized sentencing proceeding before imposing a sentence of life without parole on a juvenile offender. *Id.* at 2467.

We recognize that in holding the Eighth Amendment proscribes a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders, the Court did not expressly extend its ruling to states such as South Carolina whose sentencing scheme *permits* a life without parole sentence to be imposed on a juvenile offender but does not *mandate* it. Indeed, the Court noted that because its holding was sufficient to decide the cases before it, consideration of the defendants' alternative argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles was unnecessary. *Id.* at 2469. However, we must give effect to the proportionality rationale integral to *Miller*'s holding—youth has constitutional significance. As such, it must be afforded adequate weight in sentencing.

Thus, we profoundly disagree with the position advanced by the respondents and the dissent that the import of the *Miller* decision has no application in South Carolina. *Miller* is clear that it is the failure of a sentencing court to consider the hallmark features of youth prior to sentencing that offends the Constitution. Contrary to the dissent's interpretation, *Miller* does more than ban mandatory life sentencing schemes for juveniles; it establishes an affirmative requirement that

courts fully explore the impact of the defendant's juvenility on the sentence rendered.

As evidenced by the record, although some of the hearings touch on the issues of youth, none of them approach the sort of hearing envisioned by *Miller* where the factors of youth are carefully and thoughtfully considered.[8] Many of the attorneys mention age as nothing more than a chronological fact in a vague plea for mercy. *Miller* holds the Constitution requires more. As the majority states succinctly, "Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Id.* We believe this statement deserves universal application. The absence of this level of inquiry into the characteristics of youth produced a facially unconstitutional sentence for these petitioners. In our view, whether their sentence is mandatory or permissible, any juvenile offender who receives a sentence of life without the possibility of parole is entitled to the same constitutional protections afforded by the Eighth Amendment's guarantee against cruel and unusual punishment. The petitioners and those similarly situated are accordingly entitled to resentencing to allow the inmates to present evidence specific to their attributes of youth and allow the judge to consider such evidence in the light of its constitutional weight.

---

[8] The dissent's discussion of the individual sentencing hearings—in particular its recitation of Angelo Ham's—does not dissuade us of the accuracy of this statement. Instead it highlights the distinction between its reading of *Miller* and ours—we recognize and give credence to the decision's command that courts afford youth and its attendant characteristics constitutional meaning. The dissent would simply continue to treat the characteristics of youth as any other fact.

We are likewise unfazed by the dissent's criticism that we have failed to pinpoint an abuse of discretion; that admonition appears to arise from a fundamental misunderstanding of our holding. We have determined that the sentencing hearings in these cases suffer from a constitutional defect—the failure to examine the youth of the offender through the lens mandated by *Miller*. We decline to denominate the error an abuse of discretion because the sentencing courts in these instances did not have the benefit of *Miller* to shape their inquiries. Those courts will have the opportunity on resentencing to exercise their discretion within the proper framework as outlined by the United States Supreme Court.

## B. Appropriate Procedure

We turn finally to the scope of the resentencing hearings that we order today. *Miller* requires the sentencing authority "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." 132 S. Ct. at 2469. Consequently, *Miller* establishes a specific framework, articulating that the factors a sentencing court consider at a hearing must include: (1) the chronological age of the offender and the hallmark features of youth, including "immaturity, impetuosity, and failure to appreciate the risks and consequence"; (2) the "family and home environment" that surrounded the offender; (3) the circumstances of the homicide offense, including the extent of the offender's participation in the conduct and how familial and peer pressures may have affected him; (4) the "incompetencies associated with youth—for example, [the offender's] inability to deal with police officers or prosecutors (including on a plea agreement) or [the offender's] incapacity to assist his own attorneys"; and (5) the "possibility of rehabilitation." 132 S. Ct. at 2468.

While we do not go so far as some commentators who suggest that the sentencing of a juvenile offender subject to a life without parole sentence should mirror the penalty phase of a capital case,[9] we are mindful that the *Miller* Court specifically linked the individualized sentencing requirements of capital sentencing to juvenile life without parole sentences. 132 S. Ct. at 2463, 2467–68. Thus, the type of mitigating evidence permitted in death penalty sentencing hearings unquestionably has relevance to juvenile life without parole sentencing hearings, in addition to the factors illustrated above.

Without question, the judge may still determine that life without parole is the appropriate sentence in some of these cases in light of other aggravating circumstances. Our General Assembly has made the decision that juvenile offenders may be sentenced to life without parole, and we honor that decision. However, *Miller* requires that before a life without parole sentence is imposed upon a juvenile offender, he must receive an individualized hearing where the mitigating hallmark features of youth are fully explored.[10]

---

[9] *See* Chemerinsky, *supra* note 6.

[10] We decline the dissent's invitation to set out a specific process for trial court judges to follow when considering whether to sentence a juvenile to life without parole. The United States Supreme Court did not establish a definite resentencing procedure and we likewise see no reason to do so. We have the utmost confidence

**CONCLUSION**

We hold the principles enunciated in *Miller v. Alabama* apply retroactively to these petitioners, to those similarly situated, and prospectively to all juvenile offenders who may be subject to a sentence of life imprisonment without the possibility of parole. Accordingly, any individual affected by our holding may file a motion for resentencing within one year from the filing of this opinion in the court of general sessions where he or she was originally sentenced.

**BEATTY, J., concurs. PLEICONES, J., concurring in a separate opinion. TOAL, C.J., dissenting in a separate opinion in which KITTREDGE, J., concurs.**

---

in our trial judges to weigh the factors discussed herein and to sentence juveniles in light of this new constitutional jurisprudence.

**JUSTICE PLEICONES:**  I agree with the majority that petitioners and those similarly situated should be allowed to seek resentencing in a proceeding that complies with the standards announced in *Miller v. Alabama*, 132 S.Ct. 2455 (2012).  While I agree with the dissent that *Miller* does not require that we grant relief to juveniles who received discretionary life without the possibility of parole (LWOP) sentences, and that the majority exceeds the scope of current Eighth Amendment jurisprudence in ordering relief under *Miller*, I would reach the same result under S.C. Const. art. I, §15.

For the reasons given above, I concur in the result reached by the majority to allow persons sentenced as juveniles to LWOP to be resentenced upon their timely request.

**CHIEF JUSTICE TOAL:**  I respectfully dissent.  I would find the petitioners are not entitled to resentencing pursuant to *Miller v. Alabama*, 132 S. Ct. 2455 (2012), because the *Miller* decision is retroactive only with respect to juveniles sentenced to mandatory life without parole (LWOP), and because South Carolina utilizes a non-mandatory sentencing scheme.[11]

Pursuant to *Teague v. Lane*, 489 U.S. 288 (1989), a court decision implicating a constitutional right applies retroactively when the holding creates a new substantive rule or is a watershed rule of criminal procedure.  *Talley v. State*, 371 S.C. 535, 541–44, 640 S.E.2d 878, 880–82 (2007) (citing *Teague*, 489 U.S. at 300–01, 305, 311–12).  A rule is a new substantive rule if it prohibits a certain category of punishment for a class of defendants because of their status or offense. *Id.* at 543, 640 S.E.2d at 882; *see also Schriro v. Summerlin*, 542 U.S. 348, 352 (2004) (stating new substantive rules apply retroactively on collateral review because they "carry a significant risk that a defendant . . . faces a punishment that the law cannot impose on him" (internal quotation marks omitted)).

As the majority acknowledges, *Miller* "plainly excludes a certain class of defendants—juveniles—from specific punishment—[mandatory LWOP]." *See also Miller*, 132 S. Ct. at 1460; *People v. Davis*, 6 N.E.3d 709, 722 (Ill. 2014).  As such, I agree that *Miller* is retroactive with respect to any juvenile sentenced to mandatory LWOP.

However, I depart from the majority with respect to the scope of *Miller*'s retroactive application.  *Miller*'s holding explicitly applies only where sentencing courts were "preclude[d] . . . from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it," because the courts did not "have the opportunity to consider mitigating circumstances."  *Id.* at 2467, 2475. Were South Carolina to employ a mandatory sentencing scheme, such as those at issue in *Miller*, I would not hesitate to retroactively apply the holding to any prisoner collaterally attacking his sentence.

However, South Carolina employs a discretionary sentencing scheme, in which sentencing courts consider all mitigating evidence presented by the criminal defendant.  *See* S.C. Code Ann. §§ 16-3-20(A), -85(C).  Thus, South Carolina courts already consider the hallmark features of youth.

---

[11] *See* S.C. Code Ann. §§ 16-3-20(A), -85(C) (2003 & Supp. 2010) (permitting a discretionary sentence of LWOP for murder or homicide by child abuse, but also imposing mandatory minimum terms of imprisonment for each crime).

To the extent the majority wishes to provide courts with more explicit directions to consider the *Miller* factors in future sentencing hearings, I do not object; however, such future direction does not change the fact that petitioners' sentencing courts were given "*the opportunity* to consider mitigating circumstances." *Miller*, 132 S. Ct. at 2475 (emphasis added); *see also id.* at 2466 ("But the mandatory penalty schemes at issue here *prevent* the sentencer from taking account of these central considerations [regarding youth and impetuosity]. By removing youth from the balance—by subjecting a juvenile to the same [LWOP] sentence applicable to an adult—these laws *prohibit* a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." (emphasis added)).

In my opinion, it is a leap of faith for the majority to extend *Miller*'s holding—*expressly applicable only to mandatory sentencing schemes*—to a discretionary sentencing scheme, and to require strict compliance with a rule that the Supreme Court has not yet set forth. The majority states that it is simply "giv[ing] effect to the proportionality rationale integral to *Miller*'s holding"; however, I find significant the fact that the majority cannot cite a single other jurisdiction with a discretionary sentencing scheme that has decided to apply *Miller* retroactively to discretionary LWOP sentences. Accordingly, I would find *Miller* does not apply retroactively in discretionary sentencing jurisdictions such as South Carolina.

Ironically, the majority and I agree that *Miller*'s holding means that juveniles may not be sentenced to mandatory LWOP because courts must consider each juvenile's individual circumstances; however, the majority's holding does exactly the opposite, ordering resentencing for *all* of the petitioners, *with **no individualized consideration** of the adequacy of their original sentencing hearing*. Even if I were to agree that *Miller* applies retroactively in South Carolina, we must consider whether the sentencing courts abused their discretion in sentencing each of the petitioners.[12]

---

[12] In its zeal to reach its desired result, the majority makes no inquiry into whether the sentencing courts abused their discretion. *See State v. Dawson*, 402 S.C. 160, 163, 740 S.E.2d 501, 502 (2013) ("In criminal cases, the appellate court sits to review errors of law only. *A sentence will not be overturned absent an abuse of discretion when the ruling is based on an error of law*." (emphasis added) (citations omitted)); *see also State v. Cantrell*, 250 S.C. 376, 379, 158 S.E.2d 189, 191 (1967) (stating a judge is given broad discretion during sentencing proceedings

Perhaps the best example from the petitioners' sentencing hearings of how the courts exercised discretion and considered the juveniles' individual circumstances is shown through the joint sentencing hearing of Petitioner Angelo Ham (Petitioner Ham) and his juvenile co-defendant, Dennis Hunter (Hunter). The sentencing testimony revealed that Petitioner Ham, Hunter, and Anthony Robinson (Robinson) (collectively, the defendants) jointly planned and executed an armed robbery during which Robinson murdered the victim (Victim), an elderly store manager.[13]

The day before the murder, Robinson shot his live-in girlfriend, and the police issued an arrest warrant for Robinson for assault and battery with intent to kill. Needing money so that he could leave town and avoid arrest, Robinson approached Petitioner Ham and Hunter and asked them to help him plan a robbery. Petitioner Ham maintained that he participated in the planning and execution of the robbery under duress, claiming that Robinson threatened to kill him if he refused to help. However, others testified at the sentencing hearing that Petitioner Ham was the "leader of this pack" because Petitioner Ham was the one who knew Victim prior to the robbery, and because Petitioner Ham was aware of Victim's habit of working late at the store by himself, thus making Victim a more accessible target.

Under the influence of marijuana and cocaine, the defendants drove to Victim's store after the store had closed for the night. Hunter stayed in the car, while Petitioner Ham and Robinson approached the store. Petitioner Ham convinced Victim to open the door, and he and Robinson rushed past Victim into the store. The defendants were aware that Victim kept a gun at the store, and Robinson therefore immediately shot Victim ten times.[14]

---

and it is presumed that he or she has considered the information presented during the sentencing proceeding before imposing a punishment).

[13] At the time of the crime, Petitioner Ham was fifteen years old, Hunter was seventeen years old, and Robinson was nineteen years old. Neither Hunter nor Robinson is a petitioner here because the court did not sentence Hunter to LWOP, and because Robinson was an adult when he committed the crimes and is thus unaffected by *Miller*'s holding.

[14] Victim's body exhibited defensive wounds, indicating that he did not die immediately.

The police arrested the defendants soon after the robbery and murder. Hunter immediately gave a videotaped statement to the police, and strongly and consistently indicated his willingness to testify against both of his co-defendants. Based on Hunter's testimony, the State noticed Robinson with its intent to seek the death penalty against him.[15]

Petitioner Ham and Hunter pled guilty to robbery and murder. In a joint sentencing hearing, the Solicitor and Victim's family recounted Victim's community service and moral characteristics, such as his generosity to his employees and the community as a whole.

In mitigation, Petitioner Ham's and Hunter's attorneys painted a colorful picture of the boys' pasts. First and foremost, the attorneys cited the boys' youth, specifically noting that their youth made them ineligible for the death penalty because they lacked the judgment of an adult and could not reason or make "correct decisions" like an adult could.

Petitioner Ham's attorney stated that prior to being "waived up" to circuit court, a doctor evaluated Petitioner Ham and recommended that he remain in the juvenile system to face these charges, a recommendation which the court ultimately disregarded. The doctor noted that Petitioner Ham had a "borderline" I.Q. score and a third grade reading comprehension level.[16] Notes from Petitioner Ham's school file indicated that Petitioner Ham was "easily influenced by others" and succumbed readily to peer pressure. Moreover, the testimony revealed that Petitioner Ham had little to no contact with his father while he was growing up, that he had an older brother who was currently in jail, and that he was "in and out"

---

[15] Petitioner Ham likewise agreed to give a videotaped statement admitting his guilt in the robbery and murder; however, he was more apprehensive about testifying against Robinson because the two were incarcerated in the same facility, and he was concerned that Robinson would retaliate against him if he chose to testify. Ultimately, Robinson entered a guilty plea in exchange for receiving a LWOP sentence. After Robinson pled guilty, Petitioner Ham stated that he would have testified against Robinson had the matter gone to trial.

[16] The court later spoke to Petitioner Ham and found that, to the extent he suffered from a limited I.Q., he was nonetheless fully able to rationalize, think, and communicate.

of the Department of Juvenile Justice throughout his youth. Finally, Petitioner Ham's attorney stated that his stepfather abused him, and that Petitioner Ham witnessed numerous acts of domestic violence between his mother and stepfather.

Hunter's background was similar, revealing that his grandmother and grandfather raised Hunter and his four younger siblings. While living with his grandparents, Hunter performed well in school and avoided trouble. However, when Hunter was fourteen, Hunter's grandfather died, Hunter's performance in school declined sharply, and Hunter began "hanging out with the wrong crowd." Ultimately, Hunter dropped out of school in ninth grade. Although Hunter eventually wished to return to school, the school refused to readmit him because of his numerous behavioral problems. At age fifteen, Hunter began breaking the law, "and it was just downhill at that point." Hunter's grandmother, mother, and sister all remained involved in his life and supported him throughout the court proceedings.

After hearing all of the relevant testimony, the court acknowledged that punishing Petitioner Ham and Hunter would not restore Victim's life or the lives of his family members, who were distraught throughout the proceedings. The court differentiated between Hunter—who remained in the car throughout the robbery and murder and thus had no contact with Victim—and Petitioner Ham, who lured Victim to the door and was an active participant in the crimes. The court likewise noted that Hunter immediately realized the consequences of his actions and took steps to ensure that he and his co-defendants were brought to justice, whereas Petitioner Ham was merely willing to testify had Robinson's case gone to trial.

Finally, the court gave Petitioner Ham and Hunter the opportunity to speak. Hunter chose not to address the court or Victim's family; however, Petitioner Ham took the opportunity to inform the court that he felt his attorney was "ineffective" and that therefore his sentence "shouldn't be carried on [sic] today" because he "d[id]n't want him as [his] counsel [any] more." After resolving the issue, the court asked four separate times whether there was any evidence Petitioner Ham would like to call to the court's attention in order to aid the court in determining an appropriate sentence. Rather than expressing remorse or reiterating his attorney's previous statements, Petitioner Ham denied his guilt in the crimes entirely, stating that "just because we was at this store at a particular time . . . doesn't mean that we actually killed anybody, we actually robbed anybody, we even committed a crime." Petitioner Ham further accused Hunter and Robinson of lying in their confessions, and denied that the eyewitnesses' testimony corroborated the defendants' guilt.

The court then stated:

> Mr. Hunter and Mr. Ham, one of the things judges try to look at to see what is the possibility of some type of rehabilitation. What degree of remorse might exist when it comes to making a determination in sentencing.
>
> Mr. Hunter, from your standpoint it appears that there is a terrible crime that has been committed; that there is some recognition of what you have done, your responsibility in it, and your desire to try and have judgment entered in connection with this matter and to have the consequences of your sentence, whatever that sentence might be.
>
> Mr. Ham, on your behalf, however, it appears that there is no real sense of remorse; that having pled guilty you're now trying to recant the testimony that you previously gave; that as to your involvement that previous statements are incorrect and you have no remorse and you have no acceptance of the responsibility in connection with this matter.
>
> . . .
>
> I . . . find that . . . you have simply refused to accept and acknowledge any responsibility in here and—today and give me any hope that there is any reason to believe that you can be rehabilitated.

The court then sentenced Petitioner Ham to LWOP for Victim's murder; however, the court found that Hunter's situation was "different." The court stated that Hunter showed "some semblance that you can live long enough and/or remorseful enough that you should get the opportunity to live in society again at an advanced age." Therefore, the court sentenced Hunter to forty years for Victim's murder.

In considering Petitioner Ham's sentencing hearing, I cannot see how the sentencing court abused its discretion. Rather, I applaud the sentencing court in conducting such a thorough hearing, one in which it already considered each of the

five *Miller* factors. Accordingly, it strikes me as absurd that the majority orders resentencing for *all* petitioners without considering the adequacy of the original hearings.[17]

Further, and more egregiously, the majority fails to give adequate instructions to the resentencing courts regarding how to conduct the resentencing hearings. As demonstrated, *supra*, at least some of the original sentencing hearings were entirely compliant with *Miller*. For those cases, the majority does not provide any further direction to the resentencing courts regarding how to conduct a new hearing, nor identifies any facts that the courts should consider on remand that were not already considered. Rather, the majority simply directs all of the resentencing courts to give "constitutional meaning" to youth and its attendant characteristics, and to "fully explore the impact of the defendant's juvenility on the sentence rendered." These two directives are unmistakably vague and provide little concrete guidance, thus demonstrating the adequacy of the original hearings. *See Cantrell*, 250 S.C. at 379, 158 S.E.2d at 191 (stating that a sentencing judge is presumed to have considered the information presented during the sentencing proceeding before imposing a punishment).[18] While the majority may disagree with the propriety of the petitioners' sentences, the Court is not a fact finder, and must apply the relevant legal principles. It is of no use to say that the sentencing hearings were inadequate, and simultaneously fail to give specific instruction to the resentencing court on how to avoid the same mistake in the future.

In my view, the dangers present in *Miller*—namely, that the sentencing courts were *foreclosed* from considering age as a mitigating factor based on the

---

[17] To be sure, unlike Petitioner Ham's sentencing hearing, and given the limited records before us, some of the petitioners' hearings could be viewed as less than exemplary; however, again, we must make such a determination on an individual basis, considering the specific circumstances of each hearing, and determining whether sentencing the petitioner to LWOP in that particular case was an abuse of the sentencing court's discretion.

[18] For similar reasons, I find the majority's statement that the "absence of *this* level of inquiry into the characteristics of youth produced a facially unconstitutional sentence" unhelpful to the resentencing courts. (Emphasis added). The majority disavows requiring a sentencing hearing which mirrors the penalty phase of a capital case, but to the extent Petitioner Ham's hearing does not comply with *Miller*, I am at a loss as to what—besides a penalty-phase-like hearing—would suffice.

imposition of mandatory LWOP—were simply not present in the petitioners' cases. Specifically, when a juvenile is sentenced to LWOP by way of a discretionary sentencing scheme, the unifying principle from *Roper*, *Graham*, and *Miller*—that children, for purposes of imposing the most serious punishments, are constitutionally different—is not violated. *See Miller*, 132 S. Ct. at 2466–68, 2474–75 ("Such mandatory penalties, by their nature, preclude a sentence from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it").

Thus, I would ultimately find *Miller* does not apply retroactively to discretionary LWOP sentences, and certainly does not entitle each and every petitioner to resentencing. The petitioners each received a discretionary sentence, which *Miller* explicitly permits. *See Miller*, 132 S. Ct. at 2469.

## CONCLUSION

For the foregoing reasons, I would find the rule announced in *Miller* does not apply retroactively to the petitioners herein, or any other similarly situated defendants who collaterally attack their convictions. Therefore, I would deny petitioners' requests for resentencing.

**KITTREDGE, J., concurs.**